### In re DIPLOMAT ELECTRONICS CORP., et al., Debtors.

**Bankruptcy Nos. 87 B 12159, 87 B 12168.**

United States Bankruptcy Court, S.D. New York.

Feb. 11, 1988.

---

Nachamie, Kirshner, Levine & Spizz, New York City, for the debtors; by Alex Spizz.

Shea & Gould, New York City, for CIT Group/Equipment Financing Inc.; by Stuart Hirschfield, Brian Kriger.

## DECISION AND ORDER ON APPLICATION TO LIFT THE STAY

TINA L. BROZMAN, Bankruptcy Judge.

The CIT Group/Equipment Financing, Inc., (CIT) asks us to lift the automatic stay so that it may foreclose its perfected security interests in the debtors' accounts receivable and inventory. CIT claims that it is not adequately protected and that the debtors have no equity in their accounts receivable and inventory, neither of which are necessary for an effective reorganization. The debtors contend that CIT is adequately protected by virtue of its own collection of the accounts receivable and the debtors' safeguarding and insurance of the inventory, accomplished through the utilization of CIT's cash collateral. They admit the Diplomat Group's (defined below) lack of equity in accounts receivable and inventory but dispute RVW's and WES's (defined below) asserted lack of equity in their accounts receivable and inventory. Further the debtors maintain that this property is necessary for an effective reorganization. They have asked us not to deny CIT's motion outright but to maintain the automatic stay in effect for the additional thirty days during which they have the exclusive right to file a plan of reorganization. An evidentiary hearing was conducted on February 1 and 2, 1988.

### I.

On November 9, 1987, Diplomat Electronics Corp. (Diplomat) and its wholly owned subsidiaries (the Diplomat Group) filed Chapter 11 petitions with this Court as did Diplomat's approximately 80% subsidiary R.V. Weatherford Co. (RVW) and its wholly-owned subsidiary Western Electronic Supply Corporation (WES). All of the debtors were continued in possession of their businesses and property as debtors in possession. The cases have been procedurally, but not substantively, consolidated. Prior to its bankruptcy, the Diplomat Group was a distributor of high technology electronic components such as semi-conductors, memory chips, micro processors, logic

and linear circuits, transistors and diodes. RVW was also a distributor of electronic components; WES was a distributor of analogy meters.

CIT is an asset based lender. On April 29, 1983, CIT entered into an accounts receivable and inventory financing agreement, later amended, with the Diplomat Group. On May 28, 1986, CIT entered into an accounts receivable financing agreement, later amended, with each of RVW and WES. Pursuant to these agreements, CIT made loans and advances to the debtors based on a percentage of outstanding eligible accounts receivable and eligible inventory. These loans and advances were secured by substantially all of the debtors' assets and property. The debtors do not contest the validity and perfection of the security interests. In late October, 1987, CIT stopped advancing funds because of a large overadvance position.

As of the date of filing, the pre-petition indebtedness to CIT of the Diplomat Group was $7,820,478.43 and the pre-petition indebtedness of RVW and WES to CIT was $1,667,776.48. Pursuant to orders entered subsequent to bankruptcy, the debtors borrowed an additional $454,652.06 of CIT's cash collateral. CIT is thus owed pre and post-petition a total of $9,942,906.97 by these debtors comprising $7,970,352.80 owed by the Diplomat Group and $1,972,-553.90 owed by RVW and WES. Both before and after the bankruptcy, CIT has been collecting the debtors' accounts receivable.

The value of the RVW inventory is in the range of $500,000 if sold at auction. CIT's appraiser was uncertain, however, whether this sum included the WES inventory. Book value of the RVW and WES inventory is approximately $2.9 million and the debtors claim fair market value to be 2.4 million (of which $1.9 million is attributable to RVW and $.5 million is attributable to WES). But it is highly unlikely that the inventory could be sold for anything close to that lesser figure for two reasons. First, much of this type of "high-tech" inventory becomes quickly obsolete either because of technological advances or be-

cause of the shelf life of the electronic components. (CIT's appraiser testified that approximately half of RVW's inventory is obsolete; although the debtors quarreled with the percentage which he found obsolete, they did not challenge the assertion that a significant amount of their inventory is obsolete or dated). Second, the debtors are essentially not operating their businesses. To sell old inventory they need new inventory. Without an inventory mix, the old inventory can not be sold at full price; customers do not want to accept only partial deliveries on bulk orders. Predictably, sales after the bankruptcy out of existing inventory have been minimal and have been at discounted prices.

Prior to bankruptcy the debtors projected that with an orderly liquidation over 90 days they could obtain for the inventory approximately $1,000,000. The accounts receivable for RVW and WES, after a reserve for bad debt, total $99,255. We conclude and the debtor's chief financial officer effectively admitted that only on a going concern basis could RVW's and WES's inventory and accounts receivable bring anything close to the $1,972,553.90 which they owe to CIT. Since they are clearly not now going concerns, it would be inappropriate to utilize fair market valuation of the collateral. Accordingly, we conclude that the inventory and accounts receivable of these two debtors are worth not more and probably a good deal less than $1.5 million, and that the debtors have no equity in them.

Although it is not surprising that only three months into the case the debtors have not filed a plan of reorganization, their prospects of doing so within a reasonable period of time appear extraordinarily slim. They are not operating as a going concern but are engaged in trying to sell off their inventory while at the same time preserving enough of the appearance of an ongoing business to preserve their large net operating loss (NOL) so that a profitable enterprise might want to be merged into them. It is for this reason that they need their inventory.

They have no funding or cash on hand and cannot meet their current and future expenses. They have not found any alternate lender to replace CIT. For the past several months their ordinary course sales have been nominal or nonexistent. Their inventory is aging rapidly because it is not turning over. No new inventory has been acquired. Although they have a sales backlog of approximately $4.8 million they have been able since December 1, 1987 to complete only 1% of those sales. They have had a history of large losses over the past several years and have had losses continue after bankruptcy. They have only several employees remaining (even their president has departed), no ability to take orders in the ordinary course of business, check inventory, check credit, ship goods, invoice sales or collect their receivables, which are aging steadily.

But even more importantly, they have not met with much success in finding the $1,000,000 in equity which even they admit is a minimum to revive the business. Although one possibly interested investor expressed the willingness to perhaps invest $800,000 if CIT were to reduce its debt to $5 million, then convert half of that to redeemable preferred stock, and continue to fund these debtors, terms which were unacceptable to CIT, this $800,000 is admittedly insufficient to rehabilitate the business. (Under the proposal, all other debt, save taxes, would be converted to equity; the unsecured creditors would receive no money.) Any shortfall between the sum invested and monies actually needed would, according to the debtors, have to come from the recovery of preferential transfers or the proceeds from a $40,000,000 lawsuit against Security National Bank. But one cannot fund an ongoing business with the possibility of recovery on causes of action. And the preferences would, in large part, have to be disgorged (in return for stock) by the very vendors to whom the debtors would look for future credit to carry on their businesses.

CIT states that it does not wish on any basis to fund these debtors and that it will vote against any plan of reorganization which the debtors propose because it has no confidence in their management and prefers to liquidate its collateral (which it believes will generate $3.5 million) now. The debtors admit that without CIT's agreement, they cannot confirm a plan of reorganization.

## II.

Upon the filing of a bankruptcy petition, a secured creditor is automatically stayed, pursuant to section 362(a) of the Bankruptcy Code, from acting to realize the value of the collateral which he has been given by the debtor. The stay is pervasive and one of the most important tools available to a debtor seeking to reorganize. *See Mueller v. Nugent,* 184 U.S. 1, 14, 22 S.Ct. 269, 274, 46 L.Ed. 405 (1901); *Barclays Bank of New York, N.A. v. Saypol (In re Saypol),* 31 B.R. 796, 798–99 (Bankr.S.D.N.Y.1983). The stay ensures that the debtor's assets will not be dismembered and protects against a race to the courthouse by the vigilant, thereby promoting the equality of distribution among similarly situated creditors which is the heart of the bankruptcy policy.

But cognizant of the pernicious effects which the automatic stay could have upon secured creditors, Congress provided in subdivision (d) of section 362 that relief from the effect of the stay is appropriate under certain circumstances:

(d) On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying, or conditioning such stay—

(1) for cause, including the lack of adequate protection of an interest in property of such party in interest; or

(2) with respect to a stay of an act against property under subsection (a) of this section, if—

(A) the debtor does not have an equity in such property; and

(B) such property is not necessary to an effective reorganization.

Pursuant to section 362(g), CIT, the party requesting relief from the stay, has the

burden of proof on the issue of the debtors' equity and the debtors, the parties opposing the relief, have the burden of proof on all other issues.

■ The standards for lifting the stay set forth in Section 362(d)(1) and (2) are in the disjunctive; if the court finds either that the secured creditor lacks adequate protection or that the debtor has no equity in the property sought to be foreclosed and has no need for the property to effectively reorganize, the court must lift the stay. *See* M. Bienenstock, *Bankruptcy Reorganization* at 133 (1987) (afterwards called Bienenstock). Because we conclude that the debtors lack equity in their property and that that property is not necessary for an effective reorganization, we need not address adequate protection.

### A.

■ For purposes of Section 362(d)(2), "equity" is the difference between the value of the property and the total of the claims which it secures. *In re 6200 Ridge, Inc.*, 69 B.R. 837, 842 (Bankr.E.D.Pa.1987); *First Agricultural Bank v. Jug End in the Berkshires, Inc. (In re Jug End in the Berkshires, Inc.)*, 46 B.R. 892, 901 (Bankr. D.Mass.1985); *accord Pistole v. Mellor (In re Mellor)*, 734 F.2d 1396, 1400 n. 2 (9th Cir.1984). Where the rub occurs is in arriving at an appropriate value. The Code provides no bright-line test for this purpose but leaves to the courts the proper valuation of collateral, to be determined in light of the purpose of the valuation and of the proposed disposition or use of the property. *In re Kids Stop of America, Inc.*, 64 B.R. 397, 401 (Bankr.M.D.Fla.1986); 11 U.S.C. § 506(a). In *In re American Kitchen Foods, Inc.*, 2 B.R.Ct.Dec. 715 (Bankr.D. Me.1976) a thoughtful opinion, the court held that "the most commercially reasonable disposition practicable in the circumstances should be the standard universally applicable in all cases and at every phase of each case." Where the prospects for the debtor's rehabilitation appear dim, liquidation value may be the most appropriate standard. *Id.* at 721–22; 2 L. King, *Collier on Bankruptcy*, ¶ 361.02 at 361–22 (15th ed. 1987).

Regardless of whether we use liquidation value or an orderly liquidation value here, RVW and WES have no equity in their property. It is clear that the debtors are not going concerns but would need a great infusion of cash to regain that status. Fair market value which might cause us to conclude that RVW and WES have equity is, accordingly, inappropriate. Since CIT has met its burden of proving that the debtors have no equity in CIT's collateral, we turn to whether the debtors have met their burden of proving that the property is necessary for an effective reorganization.

### B.

Any discussion of section 362(d)(2)(B) necessarily must begin with the guidance days ago furnished to us by the Supreme Court in *United States Savings Association of Texas v. Timbers of Inwood Forest Associates, Ltd.*, —— U.S. ——, 108 S.Ct. 626, 98 L.Ed.2d 740, Bankr.L.Rep. (CCH) ¶ 72,113 (1988). There, in considering the contention of a secured creditor that undersecured creditors will face inordinate and extortionate delay if they are denied compensation for interest lost during the automatic stay as part of "adequate protection" under section 362(d)(1), the Court turned to section 362(d)(2) to demonstrate how the creditor's fears were unfounded. Justice Scalia explained that once lack of equity is shown, the debtor must establish that the collateral is necessary for an effective reorganization not by showing that, absent retention of the property, no reorganization is possible but by proving "that the property is essential for an effective reorganization *that is in prospect.*" (emphasis in original) The debtor must prove that there is " 'a reasonable possibility of a successful reorganization within a reasonable time.' " *Id.*, quoting the *en banc* decision of the Fifth Circuit in *Timbers* at 808 F.2d 363, 370–71 and nn. 12–13 and citing the cases in the footnotes.

■ We are ordinarily loathe to lift the stay during the debtor's four-month exclusive period to file a plan. Indeed *Timbers* recognizes that during the exclusive period

we properly demand less detailed showings of the likelihood of reorganization. But *Timbers* also recognizes that even during the exclusive period lack of a realistic prospect of effective reorganization requires relief from the automatic stay. *Timbers, supra,* —— U.S. at ——, 108 S.Ct. at 635, Bankr.Ct.Dec. (CCH) ¶ 72,113 at 92,269. This is just such a case.

■ In a chapter 7 case if there is no equity in the property sought to be foreclosed, the stay should be lifted because there can be no question that the property is not necessary for an effective reorganization. *In re Roxrun Estates, Inc.,* 74 B.R. 997 (Bankr.S.D.N.Y.1987). As noted in *Roxrun,* the result in a Chapter 11 case is not necessarily the same, for a liquidating plan of reorganization which is more advantageous to creditors because it is an orderly liquidation may nonetheless constitute an "effective reorganization." *Hunter Savings Assoc. v. Padgett (In re Padgett),* 74 B.R. 65 (Bankr.S.D.Ohio 1987); *In re Timbers of Inwood Forest Associates, Ltd.,* 808 F.2d 363, at 371 n. 14 (5th Cir. 1987), *aff'd,* —— U.S. ——, 108 S.Ct. 626, 98 L.Ed.2d 740 (1988); *but cf. Terra Mar Development Corp. v. Terra Mar Assoc. (In re Terra Mar Associates),* 3 B.R. 462 (Bankr.D.Conn.1980). But here there has been no showing that a liquidating plan would be more advantageous or could be confirmed. Since the type of rehabilitation which the debtors propose would involve the conversion of most debt to equity, it is questionable whether a liquidating plan providing less to creditors than does a plan preserving the businesses, would provide any benefit at all to the creditors. In any event, the court should not be left to speculate about important elements and key issues relating to the likelihood of an effective reorganization. *In re Anderson Oaks (Phase I) Ltd. Partnership,* 77 B.R. 108 (Bankr.W.D.Tex.1987).

■ The debtors' hopes and aspirations for reorganization, although well-intended, have not been supplemented by any showing that a reorganization is possible, let alone reasonably likely within a reasonable period of time. There has been no showing that the NOL may be preserved given the state of the debtors' operations. There has been no showing that any potential investor is willing to contribute sufficient equity to reestablish the debtors as going concerns. The debtors are not operating and have no income stream, nor can they liquidate their inventory in the ordinary course of business. Although the debtors' secretary testified that with a $1,000,000 or so equity infusion together with a conversion of most of CIT's debt (other than $2.5 million) to redeemable preferred stock and CIT's continued financing of the debtors, the debtors could, a year following confirmation, show a substantial positive net worth, CIT is inalterably opposed to this plan and the debtors have suggested no alternative which CIT could be forced to accept or which would be more palatable to CIT. Indeed they have acknowledged an inability to confirm over CIT's opposition. Where the debtor has not shown that it can obtain confirmation of a plan, it has not met its burden of showing that the property is necessary to an effective reorganization. *In re Woodridge North Apts., Ltd.,* 71 B.R. 189 (Bankr.N.D.Cal.1987); 2 L. King, *Collier on Bankruptcy,* ¶ 362.07 at 362–61 (15th ed. 1987). We conclude, therefore, that CIT's collateral is not necessary to an effective reorganization.

Since CIT has proven a lack of the debtors' equity in its collateral and since that collateral is not necessary to an effective reorganization, the test of Section 362(d)(2) has been met. As one respected commentator has observed:

> [T]he import of that test is that if the debtor lacks equity in property and does not need it to reorganize, then the stay is unjustified. Restraining creditors from enforcing their rights is strong medicine. The Bankruptcy Code does not sanction the stay for the stay's sake.

Bienenstock at 135. Accordingly, we are terminating the automatic stay to permit CIT to foreclose.

IT IS SO ORDERED.