In the Matter of WHITEMONT ASSOCI-
ATES LIMITED PARTNERSHIP,
Debtor.

Bankruptcy No. 2–90–01843.

United States Bankruptcy Court,
D. Connecticut.

March 20, 1991.

David I. Goldblatt, Proskauer Rose Goetz & Mendelsohn, Craig Lifland, Zeisler & Zeisler, P.C., Bridgeport, Conn., for debtor.

Donald Lee Rome, Robert A. Izard, Jr., Renee B. Allen, Robinson & Cole, Hartford, Conn., for Travelers Life and Annuity Co., creditor.

James E. Spiotto, James M. Breen, John Robert Weiss, Gary E. Green, Chapman and Cutler, Thomas A. Gugliotti, Schatz & Schatz, Ribicoff & Kotkin, Hartford, Conn., for Continental Assur. Co., creditor.

Donald R. Cassling, and David M. Neff, Jenner & Block, James T. Graham, Janet H. Stratton, Updike, Kelly & Spellacy, Hartford, Conn., for John B. Coleman, creditor.

John Collen, Sonnenschein Nath & Rosenthal, Thomas A. Gugliotti, Schatz & Schatz, Ribicoff & Kotkin, Hartford, Conn., for Country Life Ins. Co., creditor.

MEMORANDUM OF DECISION RE: MOTIONS OF TRAVELERS LIFE AND ANNUITY COMPANY, CONTINENTAL ASSURANCE COMPANY AND COUNTRY LIFE INSURANCE COMPANY TO DISMISS CASE OR, IN THE ALTERNATIVE, FOR RELIEF FROM STAY

ROBERT L. KRECHEVSKY, Chief Judge.

I.

Whitemont Associates Limited Partnership, a Connecticut limited partnership (Whitemont), was formed in 1984 to acquire for investment two hotels located in Chicago, Illinois. On September 10, 1990, Whitemont filed a chapter 11 petition in this court. Shortly thereafter three creditors whose debts are secured by mortgages on one or both of the hotels filed motions requesting either dismissal of Whitemont's chapter 11 case, or relief from the automatic stay in order to continue with pending foreclosures of their mortgages. The following background is based upon four nonconsecutive days of hearings and extensive briefing received from the appearing parties.

II.

BACKGROUND

In March, 1984, John B. Coleman (Coleman) sold two hotels—The Whitehall and The Tremont—to Whitemont for $70 million with $5.6 million paid in cash and $64.4 million paid by way of purchase-money notes secured by a mortgage. The notes called for payments of interest only at 17.5 percent per annum for the first 15 years of their 40–year term. The mortgage precluded Coleman from foreclosing on the mortgage in the event of payment defaults during the first 15 years, provided Whitemont paid Coleman the net cash flow generated by the hotels. Coleman retained an option to repurchase the hotels after April 1, 1998 at a minimum price of $169.5 million. Whitemont also paid Coleman $10.5 million in cash as prepaid interest. Coleman sold

only the hotel buildings to Whitemont, retaining ownership of the underlying realty which he leased to Whitemont.

At the time of the sale, the Tremont realty was subject to a mortgage held by Country Life Insurance Company (Country Life), and the Whitehall realty was subject to a mortgage now held by Continental Assurance Company (CNA). The purchase-money mortgage Whitemont granted to Coleman was a wraparound mortgage requiring Coleman to make the payments on the Country Life and CNA mortgages. Whitemont hired Coleman's management firm to operate and manage the hotels. The entire transaction was structured for investors seeking tax write-offs, and purchasers of the Whitemont limited partnership shares were required to establish a net worth of $1 million or $200,000 annual gross income. Whitemont in soliciting investors advised that while substantial tax benefits were projected, no cash distribution was contemplated during the first 15 years of ownership of the hotels.

In 1985, Coleman mortgaged the hotel realty to Travelers Life and Annuity Company (Travelers) for $21 million. Travelers received a second mortgage position after Country Life and CNA with Whitemont subordinating its interest in the hotels.[1]

Whitemont and Coleman had a falling-out over the management of the hotels in 1986, and Whitemont brought a suit against Coleman. Coleman, on November 24, 1986, filed a bankruptcy petition in the United States Bankruptcy Court for the Southern District of New York. Whitemont, Country Life, CNA and Travelers all filed claims and participated in the Coleman bankruptcy.

In June 1989, the New York bankruptcy court confirmed a plan of reorganization in the Coleman case which, *inter alia*, granted Coleman an option to purchase or sell the hotels with the proceeds to discharge all encumbrances; established the validity and enforceability of the Country Life,

CNA and Travelers mortgages; authorized CNA to enforce its mortgage after January 1, 1990 against the Whitehall realty, in the event Coleman had not exercised his option to purchase or sell the hotels by December 31, 1989; contained a like provision for the Country Life mortgage on the Tremont realty; and provided that Travelers could not seek to enforce its mortgage on both parcels prior to February 1, 1990. The plan further stated that Whitemont and Coleman, in the event of default under the Country Life or CNA mortgages, would not seek to restrain Country Life or CNA from the exercise of any of their rights under their mortgage documents. With reference to the Travelers mortgage, Whitemont and Coleman agreed, in the event of default, to waive all rights of redemption and not to utilize "any stay, exemption or extension law or any so-called 'Moratorium Law'." The plan was amended to state that Whitemont reserved its rights to file a voluntary bankruptcy petition and to avail itself of any applicable rights and remedies thereunder. At some point, Whitemont hired a new management firm to operate the hotels.

Coleman, with the approval of the New York bankruptcy court, had retained Morgan Stanley & Company in 1988 to locate buyers for the hotels. No buyers were found through the option period that expired December 31, 1989, and CNA started a foreclosure action in an Illinois court on March 9, 1990. Travelers started a foreclosure action in the same court on March 13, 1990, and both actions were consolidated. A final hearing on CNA's motion for summary judgment was scheduled on September 10, 1990, the date Whitemont filed its petition in this court, thereby staying that proceeding.

Travelers filed the present motion to dismiss the Whitemont case, or, in the alternative, for relief from stay, on September 27, 1990. Country Life filed a motion to dismiss or convert the case, or for relief from stay, on October 25, 1990. CNA filed its

---

1. According to Whitemont's post-hearing memorandum, Whitemont, in return for subordinating its interest to Travelers, received a $22,375,000 fee from Coleman to be paid in monthly installments through 1997. Coleman testified that a portion of the proceeds from the Travelers loan was to be used for the benefit of Whitemont.

motion for relief from stay on October 29, 1990. All motions by agreement of the parties were consolidated for hearings that started on November 1, 1990 and concluded on January 4, 1991.

During the hearings, Whitemont represented that it intended to renovate the hotels to improve their cash flows and either sell them or attract new financing. In support of these representations, Whitemont presented Robert Rosen as a witness. He testified that Whitemont had retained him in August 1990 to restructure the indebtedness of the hotels or to sell them. Rosen stated he intended to use the "cram down" provisions of the Bankruptcy Code to reduce the amount of secured positions of the mortgagees and enlist investment by third parties to upgrade the hotels. He considered the sale of the hotels an unattractive alternative.[2] As of the day he testified, December 13, 1990, Rosen had neither visited the hotels, prepared any offering materials, reviewed the existing debt structure, nor decided on a sales price. He had received no offers after approaching entities he had believed might be interested in the hotels. He was unaware of any present plans to remodel the hotels.

Whitemont has few, if any, employees, and relatively modest unsecured debt apart from the undersecured creditors. The $420,000 retainer paid prepetition to its bankruptcy attorney exceeds the unsecured debt which Whitemont listed in its schedules ($365,000). Whitemont concedes, although it denies any relevance, that a reason it has for delaying foreclosure of the mortgages is the adverse tax consequence of "recapture" which its limited partners would thereby sustain.

Coleman, who appeared at the hearings to oppose all motions, testified that he intended to submit a creditor's plan. The plan would value the hotels at approximately $20 million and utilize the cram down provisions of the Code to eliminate the Travelers and CNA secured mortgage debt in excess of such amount. Coleman and others would then offer to buy the hotels to integrate them into a large commercial development they are planning involving other properties Coleman owns immediately adjacent to the hotels.[3] After having participated in the hearings and submitted post-trial memoranda, Coleman, on March 18, 1991, withdrew his opposition to the pending motions and informed the court that he was no longer pursuing a creditor's reorganization plan.

For reasons that follow, the court determines that CNA and Travelers are entitled to relief from stay pursuant to Bankruptcy Code § 362(d)(2) and that the automatic stay imposed by Code § 362(a) shall be modified to permit them to proceed with the pending Illinois foreclosure actions.

---

2.  I've examined the possibility of sale and while I do think that it is possible and I think you can generate significant dollars, I don't think it will generate as much as the continued operation of the hotel and the restructuring of the hotels over the next—over a shorter time period than five years. But over the next few years I think you can restructure this hotel such that you can improve its cash flow, improve the asset value and ultimately generate substantially more cash than if you sold the hotel in this current economic climate. The way I would foresee structuring the financing of the property would be based upon a cram down on the existing secured debt because from the testimony I heard from the courtroom, I believe Travelers stated the value of the hotel is somewhere between 20 and $23 million. Based on those numbers I—from my understanding of the law the balance of their loan is unsecured and I believe we could structure something which we could obtain the consent of majority of the unsecured creditors, where some dollars—a substantial amount of dollars—could go to the unsecured creditors and I could hopefully protect the equity of the partnership which owns the property.
Transcript at 48–49 (12/13/90). Rosen testimony.

3.  Q. "Okay. Now you've explained how you would bring these hotels into the development plan. What would be the structure of your purchase proposal, or creditors [sic] plan with the court, as you sit here today?"
A. "We—and we—we would be a joint venture group with Walsh–Higgins and any other investors, depending on the type of financing that we finally use, would be to pay off a total of approximately $20 million to the first and second mortgagees."
Q. "That would be C & A [sic], Country Life and Travelers?"
A. "That's correct."
Transcript at 19 (1/4/91). Coleman testimony.

The alternative grounds raised by the movants will not be addressed.

## III.

## DISCUSSION

Code § 362(d)(2) provides that a court may grant relief from the stay of an act against property if "(A) the debtor does not have equity in such property; and (B) such property is not necessary to an effective reorganization." Code § 362(g) requires that the party requesting such relief bear the burden of proof on the issue of the debtor's equity in property, and the opposing party has the burden of proof on all other issues.

All parties to these proceedings acknowledge that Whitemont has no equity in the hotel properties. The Country Life and CNA mortgage debts total approximately $13 million, and the Travelers debt now approximates $38.5 million. Coleman filed a proof of claim asserting that his mortgage secures a debt which approximates $70 million. Travelers presented expert witnesses who established the value of the hotels (including the realty) on a going-concern basis at $22 million less an uncertain cost of removal or containment of asbestos. Whitemont does not dispute this valuation. Whitemont concedes CNA and Travelers are undersecured creditors. Coleman is obviously entirely unsecured.

The issue that remains under § 362(d)(2)(B) is whether the hotels are necessary for Whitemont's effective reorganization. The United States Supreme Court, in *United Savings Ass'n of Texas v. Timbers of Inwood Forest*, 484 U.S. 365, 108 S.Ct. 626, 98 L.Ed.2d 740 (1988), laid down standards for the application of the "necessary for an effective reorganization" test. In *Timbers*, an undersecured creditor

sought to be paid use value of the loan collateral where the automatic stay prevented the creditor from possessing the collateral. The Court rejected the argument that the Code entitled the creditor to such payment. In response to the creditor's contention that undersecured creditors would face "inordinate and extortionate delay if they are denied compensation for interest lost during the stay," the Court pointed to § 362(d)(2)(B). The Court held:

> What this requires is not merely a showing that if there is conceivably to be an effective reorganization, this property will be needed for it; but that the property is essential for an effective reorganization *that is in prospect.* This means ... that there must be "a reasonable possibility of a successful reorganization within a reasonable time."

*Id.* at 375–77, 108 S.Ct. at 6 (Citation omitted, emphasis in original). The Court, while indicating that what would be a reasonable time naturally depended on the facts of each case, cited, with apparent approval, instances where courts found within one to four months from the filing of the bankruptcy petition that the stay should be modified because of lack of any realistic prospect of effective reorganization. *Id.*

Whitemont, in seeking to sustain its burden of proof that the hotels are necessary to an effective reorganization, has suggested a plan that is entirely dependent on its concept of cram down with the undersecured creditors having the amount of the secured debt limited to a maximum of $22 million. Neither during the trial nor in its post-trial briefs has Whitemont dealt with Travelers' and CNA's announced intentions to make an election under Code § 1111(b)(2).[4] *Cf. In re Broad Assoc. Ltd.*

---

**4.** *§ 1111. Claims and interests.*

....

(b)(1)(A) A claim secured by a lien on property of the estate shall be allowed or disallowed under section 502 of this title the same as if the holder of such claim had recourse against the debtor on account of such claim, whether or not such holder has such recourse, unless—

(i) the class of which such claim is a part elects, by at least two-thirds, in amount and

more than half in number of allowed claims of such class, application of paragraph (2) of this subsection; or

(ii) such holder does not have such recourse and such property is sold under section 363 of this title or is to be sold under the plan.

(B) A class of claims may not elect application of paragraph (2) of this subsection if—

(i) the interest on account of such claims in such property is of inconsequential value; or

*Partnership,* 110 B.R. 632 (Bankr.D.Conn. 1990) (Shiff, J.). That section permits Travelers and CNA to elect to have their entire debt approximating $51 million be treated as allowed secured claims, notwithstanding a $22 million valuation.[5] When such an election is made, any Whitemont plan, not involving the sale of the hotels, would have to provide Travelers and CNA with deferred cash payments equaling the greater of the present value of their interest in the collateral or the amount of their allowed claims. *See,* § 1129(b)(2)(A)(i)(II).[6] Whitemont ignores the feasibility of the hotels' revenues meeting that debt service. If a plan is submitted by Whitemont which involves the sale of the hotels, § 1129(b)(2)(A)(ii) requires that Travelers and CNA be permitted to bid for the hotels and offset the full amount of their claims against the purchase price.

The court, under § 362(d)(2), conducts a balancing test. *See, In re Ashgrove*

*Apartments of DeKalb County Ltd.,* 121 B.R. 752, 757 (Bankr.S.D.Ohio 1990). Based both upon the past history of the dealings between the parties to this proceeding and the value of the hotels compared to the extent of the secured debt, the court concludes that the motions of Travelers and CNA for relief from stay should be granted. Rosen's testimony as to the prospects of the reorganization is not convincing. Whitemont has not carried its burden of proof that the hotel properties are necessary to an effective reorganization that is in prospect. *See, e.g., In re Diplomat Electronics Corp.,* 82 B.R. 688 (Bankr.S.D. N.Y.1988); *In re Terra Mar Assoc.,* 3 B.R. 462 (Bankr.D.Conn.1980).

Whitemont does not deny Travelers' assertion that it has not received a payment on its mortgage in over five years. In one sense, the Whitemont case is several years old insofar as Whitemont, these hotels, and the appearing creditors were all parties to

---

(ii) the holder of a claim of such class has recourse against the debtor on account of such claim and such property is sold under section 363 of this title or is to be sold under the plan. (2) If such an election is made, then notwithstanding section 506(a) of this title, such claim is a secured claim to the extent that such claim is allowed.

5. Section 1111(b) represents an attempt by Congress to create a balance between the debtor's need for protection and a creditor's right to receive equitable treatment. On the one hand, section 1111(b), taken in conjunction with sections 1124 and 1129, gives the debtor the power to retain encumbered property essential to the debtor's reorganization and to obtain confirmation of its plan in the face of opposition by a class of creditors whose claims are secured by such property. This preserves the debtor's ability to reorganize. On the other hand, sections 1111(b), 1124 and 1129 permit the secured lender to protect itself so as to insure reasonable treatment under a plan. Thus, § 1111(b) protects the legitimate expectation of the secured lender that the bankruptcy laws will be used only as a shield to protect debtors and not as a sword to enrich debtors at the expense of secured creditors.

5 L. King, *Collier on Bankruptcy* ¶ 1111.02[1] (15th ed. 1979).

6. *§ 1129. Confirmation of plan.*

....

(b)(1) Notwithstanding section 510(a) of this title, if all of the applicable requirements of

subsection (a) of this section other than paragraph (8) are met with respect to a plan, the court, on request of the proponent of the plan, shall confirm the plan notwithstanding the requirements of such paragraph if the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan.

(2) For the purpose of this subsection, the condition that a plan be fair and equitable with respect to a class includes the following requirements:

(A) With respect to a class of secured claims, the plan provides—

(i)(I) that the holders of such claims retain the liens securing such claims, whether the property subject to such liens is retained by the debtor or transferred to another entity, to the extent of the allowed amount of such claims; and

(II) that each holder of a claim of such class receive on account of such claim deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property;

(ii) for the sale, subject to section 363(k) of this title, of any property that is subject to the liens securing such claims, free and clear of such liens, with such liens to attach to the proceeds of such sale, and the treatment of such liens on proceeds under clause (i) or (iii) of this subparagraph; or

(iii) for the realization by such holders of the indubitable equivalent of such claims.

the unsuccessful attempt in the Southern District of New York bankruptcy court to provide for the very debts at issue in this proceeding. Such a background takes on relevance under the *Timbers* rationale that undersecured creditors should not be subject to inordinate delays.

## IV.

## CONCLUSION

The motions of Travelers and CNA for relief from stay are hereby granted.