**In the Matter of HIGHPOINT DESIGN ASSOCIATES LIMITED PARTNERSHIP, Debtor.**

**Bankruptcy No. 2-90-02161.**

United States Bankruptcy Court, D. Connecticut.

June 25, 1991.

Robert A. Izard, Jr., Susan C. Roman, Cindy J. Arenberg, Robinson & Cole, Hartford, Conn., for movant Phoenix Mut. Life Ins. Co.

Thomas A. Rouse, and Christina M. Storm, Byrne & Rouse, Hartford, Conn., for debtor.

## MEMORANDUM OF DECISION AND ORDER RE: MOTION OF PHOENIX MUTUAL LIFE INSURANCE COMPANY FOR RELIEF FROM STAY OR, IN THE ALTERNATIVE, TO DISMISS CHAPTER 11 PETITION

ROBERT L. KRECHEVSKY, Chief Judge.

### I.

In this proceeding Phoenix Mutual Life Insurance Company (Phoenix) requests relief from stay to pursue a mortgage foreclosure action. In the alternative, Phoenix moves the court to dismiss the chapter 11 petition of Highpoint Design Associates Limited Partnership (debtor) on the allegation of a bad-faith filing. For reasons that follow, the court grants the relief from stay request because the debtor has neither equity in the mortgaged property nor prospects for an effective reorganization.

### II.

### BACKGROUND

The debtor, a Connecticut limited partnership with its main office in Hartford, Connecticut, acquired in June 1988 its sole asset, a newly-constructed, nine-story building in Highpoint, North Carolina, known as The Commerce and Design Building (C & D). Highpoint, reputedly the world's largest wholesale market of furniture, contains a number of multiple-story showroom buildings like C & D—used only twice a year at the time of the April and October furniture shows. The rest of the year the buildings are closed.

The debtor purchased C & D for $16,750,-000, with Phoenix furnishing financing by way of a $14 million mortgage loan, repayable with interest-only monthly installments over a ten-year period, at the end of which term the entire principal becomes due. The annual interest rate was 10.25 percent before default and 12.25 percent while any default exists. The debtor, who has no employees, purchased C & D for investment purposes. Having no prior experience in operating a building similar to C & D, the debtor retained Forsythe Partners (Forsythe), the general partner of the building's seller, to be the property manager. The Phoenix mortgage commitment agreement with the debtor likewise contained a provision requiring that Forsythe manage the building.

Problems arose during the first year of the debtor's ownership of C & D due to faulty building construction, miscalculation of the building's total leasable space, and Forsythe's unsatisfactory performance as property manager. At the end of 1989, the debtor replaced Forsythe and retained IMC Management Corp. (IMC), a company in which certain of the debtor's principals have a proprietary interest. IMC has encountered difficulty in locating a competent building manager, and the goal of obtaining full occupancy of the building has nev-

er been achieved. C & D was fifty-five percent leased when purchased, and presently is seventy percent leased. These problems, coupled with a generally poor real estate market in North Carolina, resulted in the debtor defaulting in payment of the May 1990 and subsequent mortgage interest installments. On September 12, 1990, Phoenix started a mortgage foreclosure action, and the North Carolina court, on October 2, 1990, appointed a receiver for the building.

The debtor, on October 4, 1990, filed its chapter 11 petition. This court has since entered several cash collateral orders, consented to by the parties, under which the debtor and the North Carolina receiver jointly control receipt of rents and payment of building expenses.

At the hearing on the present motion, Phoenix established that its debt, not including attendant costs, totaled $14,815,-791.67 as of the filing date, and $15,473,-208.33 as of February 22, 1991. The post-default monthly interest installment is $142,916.67. Phoenix presented an expert witness on the issue of the debtor's lack of equity in C & D. The debtor presented witnesses to refute Phoenix's expert and to prove that a plan of reorganization was in prospect. The hearing, held intermittently, started on February 22, 1991 and concluded on April 9, 1991. The parties submitted their final briefs on May 10, 1991, and Phoenix has consented to the automatic stay remaining in force until the court issues its ruling.

### III.

### DISCUSSION

Code § 362(d)(2) provides that a court may grant relief from stay of an act against property if "(A) the debtor does not have an equity in such property; and (B) such property is not necessary to an effective reorganization." Code § 362(g) requires that the party requesting such relief bear the burden of proof on the issue of the debtor's equity in property, and that the opposing party has the burden of proof on all other issues.

### A.

### *Equity In The Property*

To prove its assertion that the debtor lacks equity in the property under foreclosure, Phoenix presented James L. Lee (Lee), a qualified appraiser with special competence in analyzing and appraising investment-grade properties. Lee opined that the fair market value of the debtor's property on January 22, 1991 was $14.2 million. The underpinning for this valuation, Lee testified, was C & D's present rent roll resulting from the seventy percent occupancy, with a projected increase in occupancy to ninety-five percent of leasable space over a thirty-month period. Lee calculated a ten-year cash flow projection, which he then discounted to present value at a twelve percent discount rate, to arrive at the $14.2 million valuation. He noted there were seven million square feet of showroom space available in the Highpoint market, with C & D contributing some 250,-000 gross square feet. On cross-examination, Lee acknowledged that by using a capitalization rate of 9.5 percent and an income capitalization approach, (and assuming ninety-three percent present occupancy of the building), C & D's value was within a range of $14.8 million to $15.3 million. Lee convincingly established his familiarity with the income and expenses associated with C & D, the market conditions in the Highpoint area, and the considerations that a knowledgeable prospective purchaser of C & D would apply.

The debtor's expert witness was Henry Chavitz (Chavitz), a Highpoint resident, who described himself as a realtor devoting one-third of his time to appraising. He attributed a $17.5 million fair market value to C & D, based on both a depreciated replacement cost analysis and an income capitalization approach. Chavitz unhesitatingly acknowledged that no buyer would presently offer $17.5 million for C & D, but that a year from now, assuming an improvement in the general real estate market, $17.5 million would represent C & D's fair market value. Chavitz's assumptions also included the appropriateness of a nine

percent net income capitalization rate, 100 percent rental collections at no expense, and that the rental rate per square foot will increase in 1992 over what tenants are presently paying for like space in the Highpoint area.

David Glaser, an officer and stockholder of Spire North Carolina Associates, the debtor's general partner, testified that in the summer of 1990, the debtor retained Coldwell Banker, a realtor with a national customer base, to find a buyer for C & D with a $21 million asking price. The debtor received no acceptable offers prior to the date of the bankruptcy filing.

I conclude that Lee's testimony as to C & D's fair market value is the more plausible of all such testimony presented, and that $15 million represents the value of the debtor's property. This value also roughly corresponds with the 1988 purchase price of $16,750,000, less an adjustment for the building's faulty construction [1] and the error in available leasable space to which Glaser testified. It also gives to the debtor the benefit of the doubt that a knowledgeable purchaser would value the property on its rentable space rather than on its presently partially-leased status. The debtor, accordingly, now lacks equity in the property.

### B.

*Property Is Not Necessary To An Effective Reorganization*

This court, in a recent ruling, *Matter of Whitemont Assoc. Ltd. Partnership*, 125 B.R. 354, 357 (Bankr.D.Conn.1991), reviewed the Supreme Court's latest analysis of § 362(d)(2)(B)'s language that the property "is not necessary to an effective reorganization."

The United States Supreme Court, in *United Savings Ass'n of Texas v. Timbers of Inwood Forest*, 484 U.S. 365, 108 S.Ct. 626, 98 L.Ed.2d 740 (1988), laid down standards for the application of the "necessary for an effective reorganiza-

tion" test. In *Timbers*, an undersecured creditor sought to be paid use value of the loan collateral where the automatic stay prevented the creditor from possessing the collateral. The Court rejected the argument that the Code entitled the creditor to such payment. In response to the creditor's contention, that undersecured creditors would face "inordinate and extortionate delay if they are denied compensation for interest lost during the stay," the Court pointed to § 362(d)(2)(B). The Court held: "What this requires is not merely a showing that if there is conceivably to be an effective reorganization, this property will be needed for it; but that the property is essential for an effective reorganization *that is in prospect*. This means ... that there must be 'a reasonable possibility of a successful reorganization within a reasonable time.'" [citation] The Court, while indicating that what would be a reasonable time naturally depended upon the facts of each case, cited, with apparent approval, instances where courts found within one to four months from the filing of the bankruptcy petition that the stay should be modified because of lack of any realistic prospect of effective reorganization.

At trial, Glaser described a plan of reorganization apparently based on a reinstatement of the mortgage, and sales of units of ownership in C & D to its present tenants. No competent evidence was offered as to the feasibility of such sales. The debtor apparently has abandoned any hope of selling its property to one buyer or to secure refinancing. Its post-trial brief is primarily devoted to urging the court to accept the $17.5 million valuation for C & D and to obtain a finding of substantial equity.

Given the substantial equity cushion which exists in the C & D Building, together with these projected cash flow changes, Debtor clearly is in a position to propose an effective plan of reorganization.... Debtor is not pinning its hopes on selling or flipping the C & D Building as the mechanism for reorganization....

---

1. Glaser had testified that the bill for the "first couple of years" for electricity was $150,000 to $200,000 over budget, and to correct the electri-

cal installation problem would "cost millions." Transcript, April 9, 1991 at 36.

Mr. Glaser has testified concerning preliminary talks with tenants regarding possible infusion of additional capital in exchange for an ownership interest.... Phoenix has failed to show that Debtor is not capable of proposing an effective reorganization in this case.

Debtor's Memorandum at 9–10 (citations omitted). Glaser had testified that based upon his own projections (including IMC managing the property at no charge), C & D's income would not fully satisfy the monthly installments due Phoenix until at least 1993.

In sum, the debtor proposes that Phoenix, an undersecured creditor, be restrained possibly for several years while the debtor attempts to increase cash flow to meet mortgage obligations and to convince potential tenant investors that the debtor's own estimate of the building's value warrants their investment. I conclude this is entirely too uncertain a basis upon which to exercise the court's discretion to deny Phoenix's motion for relief from stay. During Glaser's testimony, he conceded that during the ten-month period prior to the filing of the bankruptcy petition, the debtor repaid loans totaling $886,000 to the debtor's general partner and affiliates plus making a $150,000 distribution to a limited partner. During the same period, the debtor, after April 1990, made no payments on the mortgage note to Phoenix. Such actions belie the debtor's confidence in C & D's future.

The debtor, neither at trial nor in its post-trial brief, has presented a credible scenario for a confirmable plan to be presented in this case.[2] *Cf. In re 8th Street Village Ltd. Partnership,* 94 B.R. 993 (N.D.Ill.1988); *General Motor Inns, Inc. v. L & M Properties, Inc. (In re L & M Properties, Inc.),* 102 B.R. 481 (Bankr.E.D. Va.1989); *In re Kurth Ranch,* 97 B.R. 33 (Bankr.D.Mont.1989); *American State Bank v. Grand Sports, Inc. (In re Grand Sports, Inc.),* 86 B.R. 971 (Bankr.N.D.Ind.

1988); *In re Diplomat Electronics Corp.,* 82 B.R. 688 (Bankr.S.D.N.Y.1988).

## IV.

## CONCLUSION

This matter has been fully and ably tried by both sides. Phoenix has carried its burden of proof that the debtor does not have equity in the property subject to the Phoenix mortgage lien. The debtor has not established that, eight months after the filing of the bankruptcy petition, the property is essential for an effective reorganization that is in prospect. As a consequence, the motion for relief from stay must be, and hereby is, granted. It is

SO ORDERED.

---

2. The debtor's list of non-insider, unsecured creditors disclosed 14 creditors with total claims

of under $48,000.