**In re PEGASUS AGENCY, INC., Debtor.**

**Bankruptcy No. 94–B–22199.**

United States Bankruptcy Court, S.D. New York.

Oct. 4, 1995.

Leonard E. Lombardi, P.C., Nicholas Grammatikakis by Leonard E. Lombardi, Pleasantville, NY, for movant.

Kurtzman Haspel & Stein by Joseph J. Haspel, Spring Valley, NY, for debtor.

## MEMORANDUM DECISION GRANTING MOTION TO LIFT THE AUTOMATIC STAY

ADLAI S. HARDIN, Jr., Bankruptcy Judge.

Secured creditor Nicholas Grammatikakis a/k/a Nicholas Grammas ("Grammas") moves for an order pursuant to 11 U.S.C. § 362(d)(1) and (2) lifting the automatic stay in order to permit Grammas to conduct a sale of a parcel of real property belonging to the Debtor in accordance with a judgment of foreclosure. The petition under Chapter 11 in this case was filed on December 22, 1994.[1] To resolve issues of fact in this motion relating to the value of the property and the prospects for a plan of reorganization, an evidentiary hearing (the "Hearing") was held on July 27 and August 1.

The Debtor is a New York corporation primarily engaged in the business of owning investment real estate in the State of New York. At the time of the filing the Debtor owned six pieces of real estate but one has been sold. One of these parcels located at 560 Davenport Avenue, New Rochelle, New York (the "Property") is the subject of the instant motion. The Property is approximately six acres, roughly 280 feet wide and 940 feet deep, situated between two beach clubs, and the eastern end is beachfront bordering the Long Island Sound. The Property is improved by a three-story Tudor residence of over 5,500 square feet and a carriage house garage and apartment.

The Property was acquired by the Debtor in 1979. The mortgage and notes for which the Property is collateral were executed in May 1989 in the original principal amount of $1,500,000. The mortgagee, First Nationwide Bank, obtained a judgment of fore-

---

1. By notice dated May 17, 1995 the United States Trustee moved to dismiss or convert the case to a case under Chapter 7 on a variety of grounds. The motion has been carried on the calendar from month to month pending the outcome of this motion.

closure dated November 10, 1994 in the amount of $2,269,709.75, with interest thereon from August 31, 1994 at the rate of $301.25 per day. A foreclosure sale was scheduled for December 22, 1994 but was stayed by the filing on that date of the petition in this case. The notes, mortgage and foreclosure judgment were purchased in April 1995 for $1,200,000 by Grammas, who owns one of the beach clubs which is contiguous to the Property.

It is impossible to derive adequate financial information concerning the Debtor from the Debtor's schedules and operating reports filed in this case. The schedules and the operating reports were filed in June 1995, evidently in order to stave off the U.S. Trustee's motion to dismiss or convert. The property disclosed in the Debtor's schedule of assets consists of the Property and four other parcels of real estate, and no other material assets. No values are given for the Property or any of the other parcels of real estate. The operating reports covering the period January 1 through May 31, 1995 (no subsequent operating report has been filed to date) are patently deficient. The reports evidence deposits in the Debtor's bank account totalling $8,047.40 and aggregate disbursements of $5,895, without indicating the source of the deposits. No other information has been filed by the Debtor concerning its financial affairs, except in response to the instant motion. No plan of reorganization or disclosure statement has been filed.

Limited additional financial information concerning the Debtor was provided at the hearing on July 27 and August 1 by the Debtor's President and sole shareholder, Aaron Hochman ("Hochman"), and by appraisals and expert witnesses. No appraisals were presented for the Debtor's real estate other than the Property. Hochman testified that all parcels of real estate owned by the Debtor, other than the Property, are encumbered by the mortgage lien of a $5 million indebtedness owing to Citibank. It appears that the Citibank obligation is personal to Hochman (Tr. 84–85), and the debt is also secured by other real estate owned or controlled personally by Hochman. Hochman responded to a question from the Court by stating that the value of all of the real estate securing the $5 million Citibank debt is perhaps $8 or $9 million, but he was not certain of this (Tr. 111–112). On cross-examination, Hochman testified that, with one exception, none of the parcels of real estate owned by the Debtor has generated any rental or other income of any sort. The exception is a small apartment building, part occupied, with present rental income less than expenses (Tr. 99). For the past three to five years, Hochman testified, the Debtor has made little or no payments of principal or interest with respect to its real estate mortgaged to Citibank, and Citibank has paid all insurance costs and real estate taxes on the Debtor's real estate other than the Property.

The Property itself is a single-family residence which at all times has been and still is occupied by Hochman personally, without payment of rent.

A number appraisals of the Property and one "study" of the prospective value of the Property were presented at the hearing. Grammas presented an appraisal of the Albert & Sterling Appraisal Company Inc. by the testimony of Eugene Albert which placed the current market value at $2,300,000. On rebuttal Grammas presented an appraisal of Landmark Appraisal Group (prepared last year for Hochman and the Debtor) by the testimony of Roger Smith which placed the market value of the Property at $2 million as of September 28, 1994. The Debtor offered in evidence an appraisal prepared for it by the Gabriele Appraisal Company through the testimony of Mauro Gabriele which opined that the market value of the Property as of July 6, 1995 was $1,400,000. The Debtor also offered in evidence an appraisal as of November 19, 1993 by Houlihan & O'Malley Appraisal Co., Inc. prepared for the then mortgagee, First National Bank, by Joseph Houlihan which estimated the market value of the Property at $1,150,000. As further evidence of current market value, counsel noted the fact that First Nationwide Bank sold the loan, mortgage and foreclosure judgment to Grammas in March 1995 for $1,200,000.

Although no plan of reorganization has been presented, the Debtor through argument of counsel and the testimony of Hoch-

man asserts that a feasible plan may be presented within a reasonable time frame based upon development of the Property by subdivision and sale of lots either improved or unimproved.[2] In support, the Debtor offered a document called "Appraisal Report" of the Gabriele Appraisal Company, which was characterized by Mauro Gabriele in his testimony as being not an appraisal so much as a "study" or "analysis" based upon certain assumptions stated in the Report. At some risk of oversimplification, Mr. Gabriele presented his opinion that the "market value of the Potential Gross–Sell Out" of the Property is $2,550,000 based upon a number of assumptions, including (i) razing of the existing residence and outbuildings, (ii) obtaining all necessary governmental approvals, (iii) subdividing the Property into eight lots and (iv) installing access roads and sewage disposal facilities for each lot. Asserting that the six-acre Property might theoretically be subdivided into as many as seventeen lots, Mr. Gabriele selected eight lots as the conservative optimum number of lots considering the long and narrow configuration of the Property, the necessity for reasonable setbacks from the road at one end and the beach at the other, and the fact that the Property is bifurcated by a brackish water pond or inlet which is not susceptible of development.

In response, Grammas' real estate appraiser, Eugene Albert, presented a discounted cash flow analysis of an eight lot subdivision, utilizing the Gabriele per-lot market values for the eight lots totalling $2,550,000, assuming two years for government approvals and a third year for sell-out, taking into consideration taxes, estimated costs, discount to present value at 10%, and a 15% "developer's profit" ($382,500), all of which showed a present "indicated property value" of $1,166,774.

Hochman testified that he believed it might be possible to subdivide the Property into more than eight lots, although he offered no particulars as to how this might be done in the face of the constraints described above and the testimony and opinion of his own expert.

Hochman testified that his estimate of the total cost of subdividing the Property (including razing the existing buildings, government approvals, access roads and sewer facilities) is approximately $800,000 (although he provided no written analysis and no breakdown or calculation of this figure or any of its components) (Tr. 108–109). Hochman testified, however, that it would be his intention not merely to subdivide the Property but to build houses on the lots (Tr. 72–73, 105–106). Hochman testified, based upon certain studies he said he had made,[3] that he believed a 3,000 square foot house could be constructed on each of the eight lots projected by Gabriele at a cost of $80 per square foot, or $240,000 per house, and that the lots as so improved could be sold at an average price of $500,000 to $600,000 each (Tr. 72–73, 106–111). The Court notes that, assuming sale of all of the lots at $600,000, this would produce gross sales revenue for all eight lots of $4,800,000. Assuming a $1,920,000 total cost of building the eight houses (based on Hochman's estimate of $240,000 per house) and Hochman's estimate of $800,000 costs to subdivide the Property to the point of access roads and sewer facilities, the net revenue under Hochman's concept would be $2,080,000 ($4,800,000, less $1,920,000, less $800,000). The current indebtedness owing to Grammas is $2,343,000 (Tr. 111).

One additional factual predicate is necessary for decision on this motion. The Debtor acknowledges, indeed avers, that the lien of the Grammas mortgage and the foreclosure

2. The plan contemplated by the Debtor would initially entail development of the Property, and subsequently development of the other parcels of real estate owned by the Debtor (Tr. 100–101). But no analysis, evaluation, projection or conceptualization of any kind was offered with respect to any of the other real estate.

3. When asked by his counsel to describe the financial analysis which he had undertaken to determine the feasibility of developing the Prop-

erty, Hochman gave the following testimony (in its entirety):

A. Well, I decided to research the standard manuals of the building costs estimations such as Marshall Swift and there was also a service that I took to see what it would cost to build the properties of this nature. I attempted to estimate by talking to people in the field as to what it would cost to do some of the work that you described. And my conclusion was that there was a profit to be made. (Tr. 72)

judgment far exceed the present value of the Property, and that all of the Debtor's assets combined produce nil or de minimis income. The Debtor and Hochman concede that the only source of funding for a plan of reorganization is Hochman himself. While Hochman did not submit a personal financial statement, he offered testimony and a prospectus of NACOLAH Holding Corporation ("NACOLAH") (a privately-held insurance holding company, the stock of which is not publicly traded) to support a valuation of his stock interest in NACOLAH at some $30 million, assuming the company can be sold at a given price. Hochman also testified that he has current and prospective income of $1,500,000 to $2,000,000 annually from dividends on his NACOLAH stock and from other sources (Tr. 74). Hochman testified and represented through counsel that he is ready, willing and able to fund all of the Debtor's costs for real estate taxes and insurance for the Property, as well as "adequate protection" payments to Grammas at the annual rate of 9% of Grammas' $1,200,000 cost of acquiring the mortgage. There is no evidence of record as to how long Hochman is willing to continue this funding. Hochman's testimony as to his willingness to fund the costs of development of the Property will be examined below.

■ This motion is based on both subdivisions (1) and (2) of 11 U.S.C. § 362(d). With respect to subdivision (1) (lack of adequate protection), Grammas asserts that his and his predecessor-mortgagee's position has already been and continues to be eroded at the rate of $301.25 per day.[4] The Debtor responds, with respect to subdivision (1), by asserting that Grammas is not entitled to an allowance of interest under section 506(b) and by pointing to Hochman's undertaking to pay the insurance, the taxes and such additional adequate protection as the Court might deem appropriate within reason. Based upon the appraisals offered in evidence and the testimony of the experts, I have no difficulty in finding as a fact that the value of the Property at the time of commencement of this case was substantially less than the indebtedness

secured by the lien on the Property or by the judgment of foreclosure, for purposes of section 506(b). However, I decline to rule upon the question of adequate protection under subdivision (1) because it is my conclusion that the Debtor has not sustained its burden under subdivision (B) of subsection (2) of section 362(d).

■ Turning to section 362(d)(2), the Debtor acknowledges and I find as a fact that the Debtor does not have equity in the Property under subsection (A). The issue, then, is whether the Property is "necessary to an effective reorganization" under subdivision (B). That issue turns on whether there is a realistic likelihood of a plan of reorganization within a reasonable period of time. The leading case on the point is the decision of the Supreme Court in *United Savings v. Timbers of Inwood Forest*, 484 U.S. 365, 375, 108 S.Ct. 626, 633, 98 L.Ed.2d 740, 751 (1988), where the Supreme Court articulated the test under subsection (B) of section 362(b)(2) that: "there must be 'a reasonable possibility of a successful reorganization within a reasonable time.'" The Court said in *Timbers:*

> What this requires is not merely a showing that if there is conceivably to be an effective reorganization, this property will be needed for it; but that the property is essential for an effective reorganization *that is in prospect.*

*Id.* (emphasis in original). *See also, In re Ritz–Carlton of D.C., Inc.,* 98 B.R. 170, 172 (S.D.N.Y.1989); *In re Kent Terminal Corp.,* 166 B.R. 555, 562 (Bankr.S.D.N.Y.1994) ("Under the standards outlined in *Timbers* and its progeny, [Debtor] must show that the Property is essential to an effective reorganization that is not only feasible but in prospect."); *In re de Kleinman,* 156 B.R. 131, 137 (Bankr.S.D.N.Y.1993); *In re 499 W. Warren Street Associates,* 151 B.R. 307, 310 (Bankr.N.D.N.Y.1992); *In the Matter of Whitemont Associates Ltd. Partnership,* 125 B.R. 354, 357, 359 (Bankr.D.Conn.1991); *In the Matter of Highpoint Design Associates Ltd. Partnership,* 128 B.R. 505, 508 (Bankr.

4. Although the estimates of value by the various experts have differed widely, and although Grammas has complained that the Property is not being well maintained, Grammas has not argued that the value of the Property has or is likely to decline materially for either intrinsic or extrinsic reasons. The evidence would not support such an argument.

D.Conn.1991); *In re Diplomat Electronics Corp.*, 82 B.R. 688, 692 (Bankr.S.D.N.Y. 1988); *In re Riviera Inn of Wallingford, Inc.*, 7 B.R. 725 (Bankr.D.Conn.1980) ("likelihood of a successful reorganization on the horizon").[5]

██ The burden is on the Debtor to establish that there is a reasonable likelihood of a plan within a reasonable period of time. *In re New Era Company*, 125 B.R. 725, 730 (S.D.N.Y.1991); *In re Kent Terminal Corp.*, *supra*, 166 B.R. at 560; *In re de Kleinman*, *supra*, 156 B.R. at 137; *In re 499 W. Warren Street Associates, supra*, 151 B.R. at 310; *In re White Plains Development Corp.*, 140 B.R. 948, 950 (Bankr.S.D.N.Y.1992) ("the debtor must show that the properties are necessary for an effective reorganization, as set forth in 11 U.S.C. § 362(d)(2)(B)."). In this case, the focus of inquiry is on Hochman, since Hochman is the only source of funding for a plan for this Debtor. Hochman's testimony, considered in light of the figures relating to projected costs and values, provides no support for a conclusion or finding that there is a reasonable prospect of a plan of reorganization in this case—indeed, it supports the opposite conclusion.

Hochman's testimony concerning his purported "analysis" upon which his financial estimates and projections for development of the Property were supposedly based, did nothing to support the credibility of those estimates and projections. *See* footnote 3, above, and Hochman's testimony at Tr. 108–109 concerning his alleged calculation of the $800,000 projected costs of subdividing the Property. The likelihood of building eight 3,000 square foot houses in New Rochelle in the late 1990s for an average cost of $240,000 appears fanciful at best. But even accepting Hochman's estimates and projections, including his maximum estimate of $600,000 as the average selling price for the eight lots, Hochman's own testimony as to the circumstances under which he will be willing to fund development of the Property is fatal to the Debtor's position on this motion. When asked by his counsel why he would be willing to incur the costs of developing the Property, Hochman responded "I would hope to make a profit on the transaction" (Tr. 71). Having testified on direct examination that he would offer "a meaningful plan of reorganization" upon approval of a subdivision, when asked what he meant by "meaningful", Hochman testified: "[a plan] that will reflect the interest of the various parties and offer me an opportunity to make a profit" (Tr. 83). On redirect examination, Hochman explained the kind of profit which would induce him to expend his own money on the Debtor's Property. He testified:

> I thought renting the properties would not produce much income and it would take a long time to do. I thought getting a plan of development where I could actually do something with the properties and make maybe a million or two million dollars was where I should spend my time rather than trying to rent buildings that needed some renovation in order to be attractive to be rented. I just didn't think that was where I should be spending my efforts.... As a businessman, my mission is to try to find something like to make a lot of money; not just cover the costs. (Tr. 112–113)

In short, not surprisingly Hochman's motivation in expending several million dollars of his own money in the risky business of developing the Property of the Debtor is "to make a lot of money", which he quantified as "maybe a million or two million dollars". However, according to Hochman's most optimistic projections offered at the trial the Debtor's net revenues from sales of the eight lots (without any provision for capital gains taxes) would be $2,080,000. The indebtedness owing to secured creditor Grammas as of the date of trial was approximately $2,343,000, some $263,000 in excess of the net pre-tax proceeds. Thus, the Debtor's own evidence proffered at trial refutes the likelihood of any feasible plan of reorganization

---

5. The *Timbers* test does not mean that a motion under section 362(d) for relief from stay should become a confirmation hearing. The question is whether there is a realistic likelihood that the debtor can propose a plan which is not patently unconfirmable, within a reasonable period of time. *See, In re Kent Terminal Corp.*, 166 B.R. at 560; *In re 160 Bleecker Street Associates*, 156 B.R. 405, 411 (S.D.N.Y.1993); *In re White Plains Development Corp.*, 140 B.R. 948, 950 (Bankr. S.D.N.Y.1992).

within any reasonable time period. Hochman's conclusory and unsubstantiated expressions of optimism and intention to proceed with development are belied by his own evidence and do not provide grounds for denying the secured creditor's motion to lift the stay. *See, In re New Era Company, supra,* 125 B.R. at 730 ("pipe dreams" not enough to withstand a section 362(d)(2)(B) motion); *In re Diplomat Electronics Corp.,* 82 B.R. 688, 693 (Bankr.S.D.N.Y.1988) ("the court should not be left to speculate about important elements and key issues relating to the likelihood of an effective reorganization.... The debtors' hopes and aspirations for reorganization, although well-intended, have not been supplemented by any showing that a reorganization is possible, let alone reasonably likely within a reasonable period of time"); *In re Kent Terminal Corp., supra,* 166 B.R. 555, 562 (Bankr.S.D.N.Y.1994) *citing Barclays Bank of New York, N.A. v. Saypol (In re Saypol),* 31 B.R. 796, 803 (Bankr.S.D.N.Y.1983) ("It goes without saying that an effective reorganization cannot be based solely on speculation").

To summarize my findings based on the testimony and other evidence of record on this motion, I conclude as follows:

(1) The lien of the mortgage and of the foreclosure judgment substantially exceeds the value of the Property, both now and as of the date of filing, and accordingly the Debtor has no equity in the Property under section 362(d)(2)(A).

(2) The only possible source of funding of a plan of reorganization is the Debtor's President and sole shareholder, Hochman.

(3) There is no evidence in the record demonstrating that Hochman personally, or others on his behalf, have performed the kind of research, analysis and projections, generally referred to as due diligence, required to make any reliable assessment of the financial feasibility of any plan to develop the Property.

(4) Hochman testified quite clearly that he is not interested in making any substantial investment of his own capital unless there is a reasonable prospect that he will make a profit on that investment. While a person motivated by altruism might invest substantial sums solely to benefit his creditors, I will take Mr. Hochman at his word that he is not so motivated and that he will not expend money to develop the Property absent expectation of profit for himself.

(5) Debtor's own estimates and projections refute such an expectation. Using the projections of cost and sales revenue offered in evidence by Hochman and by his real estate expert, Gabriele, there appears to be no prospect of realizing net income from any prospective development of the Property which would be sufficient to pay off the mortgage or the foreclosure judgment held by Grammas, let alone produce a profit for the Debtor or Hochman.

Based on the evidence at the Hearing, it is impossible to make findings as to the prospects for a plan of reorganization under section 362(d)(2)(B) required by *Timbers of Inwood Forest* and other governing authority. Accordingly, the motion to lift the stay must be granted.

Submit order.