**In re KENT TERMINAL CORP., Debtor.**

**Bankruptcy No. 93 B 42752 (FGC).**

United States Bankruptcy Court,
S.D. New York.

March 28, 1994.

T. Brock, Mudge Rose Guthrie Alexander & Ferdon, New York City, for Friesch–Groningsche Hypotheehbank Realty Credit Corp. ("FGH").

B. Weston, Law Offices of Burton S. Weston, Manhasset, NY, for Kent Terminal Corp. ("Kent").

## Memorandum of Decision on Motion for Relief from Stay or to Dismiss Case

FRANCIS G. CONRAD,[*] Bankruptcy Judge.

This contested matter is before us[1] on FGH's motion for relief from stay or for dismissal of Kent's chapter 11 petition. 11 U.S.C §§ 101, *et seq.*[2]

Following oral argument of FGH's motion on September 23, 1993, and an agreed briefing schedule, we requested supplemental briefs addressing the general confirmability of Kent's earlier filed plan of reorganization (the "Plan") over FGH's various objections, including whether FGH will be able to credit bid in the event that Kent seeks confirmation of its Plan under § 1129(b)(2)(A)(ii) and whether FGH may exercise its § 1111(b)(2) election if Kent, alternatively, seeks confirmation of the Plan under § 1129(b)(2)(A)(i). We consider these issues solely in the context of FGH's motion for relief from stay and, in particular, with respect to whether the Plan is patently unconfirmable. In our discussion, *infra*, we hold that the Plan does not present a reasonable probability, or possibility, of a successful reorganization within a reasonable time. The motion will be granted.

### Facts

Kent is a real estate investment corporation created under New York law. Kent's single asset is 33.8 acres of undeveloped real estate along the Brooklyn waterfront between North 5th and 11th Streets (the "Property"). The Property is zoned for industrial and manufacturing use. In anticipation that the Property would be rezoned for mixed use, i.e., commercial and residential, Kent purchased the Property in 1987.

FGH is a Delaware corporation. Before purchasing the Property, Kent obtained mortgage financing from FGH in the form of a three-year, interest-only loan for $10.5 million.[3] On April 27, 1992, FGH commenced a foreclosure action against Kent in New York Supreme Court, Kings County. In its complaint, FGH alleged various defaults under the loan agreement, including nonpayment of principal, interest, taxes, insurance, and maintenance costs.

On May 26, 1993, Kent filed its voluntary petition for relief under Chapter 11 of the Bankruptcy Code. Since the filing date, Kent has remained in possession of its estate and has operated its property as a debtor-in-possession under §§ 1107 and 1108. FGH's state court foreclosure action is stayed under § 362.

---

[*] Sitting by special designation.

[1] Our subject matter jurisdiction arises under 28 U.S.C. § 1334(b) and the "Standing Order of Referral of Cases to Bankruptcy Judges" of the United States District Court for the Southern District of New York, dated July 10, 1984 (Ward, Acting C.J.). This is a core matter under 28 U.S.C. § 157(b)(2)(G). This Memorandum of Decision constitutes findings of fact and conclusions of law under Fed.R.Civ.P. 52, as made applicable by Fed.R.Bankr.P. 7052.

[2] All statutory references are to Title 11 of the U.S.C. unless otherwise noted.

[3] In addition to FGH's first mortgage, several other liens encumber the Property, including second, fourth, and fifth mortgages in the principal amounts of $2.2 million, $750,000, and $250,000, respectively.

FGH claims that Kent owes $16.186 million under the loan agreement, including (1) unpaid principal in the amount of $10,500,000, (2) postmaturity, prepetition interest in the amount of $4,800,842.43, and (3) reimbursement for taxes, assessments, and other expenses paid by FGH in the amount of $885,180.25. Kent disputes the amount of FGH's claim and, in particular, whether FGH is entitled to postmaturity, prepetition interest at 18% (4% over the standard interest rate provided in the loan agreement). If the postmaturity rate is allowed, FGH's claim is $16.186 million; if not, FGH's claim is $13.46 million.

FGH filed a motion for relief from stay or for dismissal of Kent's Chapter 11 petition. Following a clerical error resulting in the loss of its original motion for relief from stay, FGH filed a duplicate motion for relief from stay or for dismissal of the case on November 1, 1993. Kent previously filed an objection to FGH's motion on September 21, 1993.

Kent filed its plan of reorganization on September 21, 1993. According to the Plan, Kent will pay its creditors with proceeds derived from the sale of the Property to two buyers in two separate transactions. Kent proposes to sell the Property, in part, to Nekboh Recycling Corporation ("Nekboh") for $3 million, subject to Nekboh's ability to obtain financing from the New York City Industrial Development Agency.[4] Under the Plan, FGH will receive 87.5% ($2.625 million) of the Nekboh net proceeds. Plan at ¶ 4.04(b). Kent will pay the remaining 12.5% of the Nekboh net proceeds to its second mortgagee in satisfaction of the second mortgagee's allowed secured claim. Plan at ¶ 4.05.

Kent then proposes to sell the remaining property to Newco, a New York corporation that, according to the Plan, will be formed to purchase the relevant parcel of the Property for $12 million. Plan at ¶ 6.01(b). FGH will receive $9.84 million from the Newco sale. Other creditors, including general unsecured creditors, will receive the remainder of the proceeds. Newco will not purchase the remainder of the Property unless it is rezoned for retail use within two years of the Plan's consummation date. As of this writing, rezoning has not occurred.[5]

---

**4.** Nekboh currently leases a portion of the Property on a month-to-month basis under what is now an expired lease agreement dated December 19, 1991. On November 30, 1992, Nekboh agreed to purchase the leased premises for $3 million. No closing has occurred. As of this writing, Nekboh pays monthly rent directly to FGH.

**5.** According to the particulars of the plan, Kent will pay FGH's allowed secured claim, allegedly in full, with the proceeds of the Nekboh and Newco sales. Section 4.04 of Kent plan provides that:

Class 4 Claimant: The Allowed FGH Secured Claim of the Class 4 Claimant shall be fully satisfied and discharged as follows (there being no right to elect application of Bankruptcy Code § 1111(b)(2) in that the Property is being sold under and pursuant to the Plan[ ] (see, Bankruptcy Code § 1111(b)(1)(B)(ii)):

(a) Upon the Consummation date, there shall be applied and credited against the Allowed FGH Secured Claim all rental payments received by the Debtor under the Nekboh Lease and paid over to FGH under the terms of the FGH Loan Documents from and after the Petition Date.

(b) Upon the closing of the sale of the Nekboh property to Nekboh pursuant to and under the Plan and the Nekboh Purchase Agreement, there shall be paid to FGH and applied and credited against the FGH Secured Claim (consistent with the FGH Non–Disturbance Agreement) eighty seven and one half percent (87½%) of the net proceeds of such sale.

(c) The Allowed FGH Secured Claim as reduced by the applications and the credits detailed in subparagraphs (a) and (b) above, shall be paid on the Settlement Date from the proceeds of the Property Purchase Price delivered by Newco for the purchase of the Remaining Property. The Allowed FGH Secured Claim (as reduced by the applications and credits detailed above) shall be evidenced by a promissory note executed and delivered by the Debtor to FGH on the Consummation Date (the "New FGH Note"). The New FGH Note shall be payable on the Settlement Date (which date shall be no later than two years after the Consummation Date[ ] ].

(d) The New FGH Note shall, from and after the Consummation Date, continue to be secured by the First Mortgage in and against the Property. As additional collateral security for the Debtor's obligations under the New FGH Note, the Debtor shall, on the Consummation date, deliver to FGH or its designee, in escrow, a deed to the Property in lieu of foreclosure and the Bankruptcy Court shall retain jurisdiction over the Debtor specifically for the following purpose. Upon the Debtor's failure to pay the New FGH Note on the Settlement Date, FGH or its designee shall be permitted to release the deed from escrow and convey the deed to itself or its nominees or designees in lieu of foreclosure, pursuant to the

FGH currently receives rent payments from Nekboh under an assignment agreement. Rent payments are, however, insufficient to pay applicable taxes. Under the Plan, Kent alleges that monies from an investor group will enable it to pay taxes as they come due.

At the hearing on September 23, 1993, counsel for FGH stated that its appraiser would value the Property at $10.9 million. Transcript at 5. FGH's appraiser never testified about the value of the Property. Kent did not come forward with its own appraisal. Kent argued, however, that the Property's value, assuming rezoning and consummation of the Nekboh and Newco sales, would be close to $14 million. Transcript at 20. Kent does not dispute the validity of FGH's lien.[6] Kent and FGH agree that FGH is undersecured.

In its Plan, Kent proposes to sell the Property, if rezoning occurs, within two years of the effective date. In the event that rezoning does not occur within the two-year period before the drop-dead date, FGH may take the deed to the Property from escrow in lieu of foreclosure. If the Property is sold, the Plan denies FGH the opportunity to credit bid or to seek fully secured treatment under § 1111(b)(2). FGH's liens will not attach to the proceeds of the sales to the full allowed amounts of FGH's claims. Instead, the Plan allocates a certain percentage of the sale proceeds to pay the second mortgagee and other lesser priority claimants. Kent argues that the Plan is nevertheless fair and equitable because it gives FGH recourse status under § 1111(b)(1)(A). FGH argues that the

Plan violates various cramdown requirements. We address FGH's arguments in turn.

## Discussion

### I. *Standard of Review.*

Section 362(a) of the Code stays all actions against property of a debtor. A creditor may, upon proper motion, obtain relief from stay as outlined in § 362(d).[7]

FGH seeks relief from stay under § 362(d)(2) of the Bankruptcy Code because, FGH submits, there is no equity in the Property and the Property is not necessary for Kent's reorganization. Kent does not dispute its lack of equity in the Property. There is, however, considerable debate between the parties regarding the necessity of the Property to Kent's reorganization and, by implication, regarding whether Kent's proposed Plan is reasonably confirmable as a matter of law.

The party opposing relief from stay has the burden of proof on all issues except the debtor's equity in the property. *See* § 362(g). Once the movant shows that the debtor has no equity in the property or, as is the case here, there is no dispute as to the debtor's lack of equity, the burden shifts to the debtor to show that the property is necessary to an effective reorganization. *United Sav. Ass'n v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365, 375–76, 108 S.Ct. 626, 632–33, 98 L.Ed.2d 740 (1988); *In re 160 Bleecker Street Assocs.*, 156 B.R. 405, 410 (S.D.N.Y.1993); *In re 500 Fifth Ave. Assocs.*,

---

Court's jurisdiction and this Plan, free and clear of all subordinate liens and interests. The Debtor shall have the right to prepay, in whole or in part, the total amount due under the New FGH Note under the terms of the Plan without premium or penalty.

(e) The Debtor shall join with the Class 4 Claimant in the execution, acknowledgement, delivery and recordation of any documents necessary to amend the Mortgage and other, related documents and instruments to conform and give full legal effect to the terms, conditions, provisions and purposes of the Plan. Upon compliance with the foregoing, on the Consummation Date, all prior defaults in the terms of and conditions of the instruments, agreements and other papers evidencing the FGH Secured Claim shall be deemed cured.

6. Whether FGH is entitled to default interest remains at issue. Transcript, p. 20.

7. Section 362(d) provides that:

On request of a party in interest and after notice and a hearing, the court shall grant relief from stay provided under subsection (a) of this section, such as by terminating, annulling, modifying, or conditioning such stay—

(2) with respect to a stay of an act against property under subsection (a) of this section, if—

(A) the debtor does not have an equity in such property; and

(B) such property is not necessary to an effective reorganization.

148 B.R. 1010, 1015 (Bankr.S.D.N.Y.), *aff'd,* 1993 WL 316183 (S.D.N.Y.1993).

■ In *Timbers, supra,* 484 U.S. at 375–76, 108 S.Ct. at 633, the Supreme Court stated that an "effective reorganization" under § 362(d)(2)(B) requires "a reasonable possibility of a successful reorganization within a reasonable time." The debtor must establish "not merely that if there is conceivably to be an effective reorganization, this property will be needed for it; but that the property is essential for an effective reorganization that is in prospect." *Id.* The specific criteria for determining confirmability are provided in § 1129. *In re 500 Fifth Ave. Assocs., supra,* 148 B.R. at 1016 (citations omitted). In light of *Timbers,* the applicable test for relief from stay under § 362(d)(2)(B) is feasibility, i.e., that confirmation of a plan is practical and reasonable under § 1129. *Carteret Sav. Bank v. Nastasi–White, Inc. (Matter of East–West Assocs.),* 106 B.R. 767, 774 (S.D.N.Y.1989); *See, e.g., In re 500 Fifth Ave. Assocs., supra,* 148 B.R. at 1016 (*Timbers* test requires a showing by the debtor and a determination by the bankruptcy court that the plan is not patently unconfirmable and has a realistic chance of being confirmed.); *In re 266 Washington Assocs.,* 141 B.R. 275, 281–82 (Bankr.E.D.N.Y.), *aff'd,* 147 B.R. 827 (E.D.N.Y.1992) (court will review confirmation standards in determining whether reorganization is possible).

■ As a general rule, our analysis of a plan's feasibility under § 362(d)(2) is not the same as our review of a plan at confirmation. *See In re White Plains Dev. Corp.,* 140 B.R. 948, 950 (Bankr.S.D.N.Y.1992) (citation omitted). As numerous courts have held, a relief from stay hearing should not become a confirmation hearing unless relief from stay and confirmation are considered concomitantly. *See, e.g., In re 160 Bleecker Street Assocs., supra,* 156 B.R. at 411 ("A motion for relief from stay should not be turned into a confirmation hearing; the debtor need only show that there is a lack of equity, [that] the proposed plan has a realistic chance of being

confirmed[,] and [that the plan] is not patently unconfirmable.") (citation omitted).

■ One of the key differences between a § 362(d)(2) analysis and a § 1129 analysis is the level of scrutiny used by a court in reviewing the debtor's feasibility evidence. In a run-of-the-mill relief from stay motion, a debtor need not satisfy the higher level of scrutiny imposed in a confirmation hearing. The debtor need only show that its proposed plan has a reasonable possibility or probability of achieving confirmation. By comparison, feasibility at confirmation is defined under § 1129(a)(11).[8] In construing this section and, in particular, Congress's use of the word "likely," most courts require that a plan offer a probability of success, rather than a mere possibility. For example, in *Kane v. Johns–Manville Corp.,* 843 F.2d 636, 649 (2d Cir. 1988), the Second Circuit wrote that at confirmation, the "feasibility standard is whether the plan offers a *reasonable assurance* of success [although s]uccess need not be guaranteed." Moreover, § 1129(a)(11) prevents confirmation of "visionary schemes" beyond the financial wherewithal of the debtor or, in other words, outside a reasonable probability of success. *See* 5 L. King, *Collier on Bankruptcy,* ¶ 1129.02[11] at 1129–58, 1129–59 (15th ed. 1993), *citing, e.g., Tennessee Publishing Co. v. American Nat'l Bank,* 299 U.S. 18, 22, 57 S.Ct. 85, 87, 81 L.Ed. 13 (1936) (despite the sincerest of motives, courts are "not bound to clog [their] dockets with visionary or impracticable schemes for resuscitation.") Thus, the Second Circuit's "reasonable assurance" language in *Kane, supra,* imposes a heightened standard at confirmation, thereby requiring that reorganization more likely than not to occur, rather than merely "probable" or "possible."

■ To reflect the ongoing and cumulative costs of reorganization to secured creditors, a debtor's burden of exhibiting a reasonable probability of a successful reorganization increases as the case progresses. *See, e.g., Timbers, supra,* 484 U.S. at 376, 108 S.Ct. at

---

8. Section 1129(a)(11) provides that:
   Confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor

or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan.

633 ("bankruptcy courts demand less detailed showings during the four months in which the debtor is given the exclusive right to put together a plan ..."); *In re 160 Bleecker Street Assocs., supra,* 156 B.R. at 411 ("The debtor's burden of establishing a 'reasonable possibility of a successful reorganization within a reasonable time' increases as time passes....") In the salad days of reorganization when debtors are green in judgment and harm to creditors is relatively low, a debtor need not prove that its plan is confirmable beyond peradventure. Instead, a debtor must show only that "the things which are to be done after confirmation can be done as a practical matter." *Travelers Life & Annuity Co. v. Ritz–Carlton of D.C., Inc. (In re Ritz–Carlton of D.C., Inc.),* 98 B.R. 170, 172 (S.D.N.Y.1989) (citation omitted). If, conversely, a secured creditor seeks relief from stay in the later stages of the case, the relative costs to secured creditors increase, and the debtor must undergo comparatively greater scrutiny regarding whether the proposed plan is confirmable as a matter of law. *See generally, Sumitomo Trust & Banking Co., Ltd. v. Holly's, Inc. (In re Holly's, Inc.),* 140 B.R. 643, 698 (Bankr.W.D.Mich.1992) (compares threshold showing for confirmable plan in early days of case versus threshold showing of assured feasibility after expiration of exclusivity period); *In re Ashgrove Apts. of DeKalb County, Ltd.,* 121 B.R. 752, 756 (Bankr.S.D.Ohio 1990) (debtor's burden of proof that plan is confirmable increases as case progresses); O'Connor, *Application of the "Feasibility" Test under Section 362(d)(2): Did Timbers Really Change Anything?,* 9 Bankr.Dev.J. 133 (1992) (suggests good faith as minimum standard for proving a reorganization in prospect during exclusivity period).

A debtor satisfies its burden of proving a reorganization in prospect if, early in the reorganization process, it offers sufficient evidence to indicate that a successful reorganization within a reasonable time is possible or plausible. In *Timbers, supra,* Justice Scalia wrote that courts historically require a less detailed showing of feasibility within the 120–day exclusivity period provided in § 1121(b). *Timbers,* 484 U.S. at 376, 108 S.Ct. at 633. During the exclusivity period, a debtor's evidentiary burden is relatively light in order to allow the debtor an opportunity to negotiate a plan that is reasonably confirmable within a reasonable time. The 120–day exclusivity period alone does not, however, shield a debtor from relief from stay when there is no reasonable prospect of an effective reorganization. *Id.* at n. 2. As time passes and the debtor's exclusivity period expires, the debtor must meet a somewhat higher standard, i.e., that confirmation of the proposed plan is not only possible but "probable." The more time that passes between the expiration of the exclusivity period and the date of the relief from stay motion, the greater the debtor's evidentiary burden becomes. Notwithstanding this time-sensitive evidentiary burden, the final burden of proof at both the relief from stay and confirmation hearings remains a preponderance of the evidence.[9]

The Bankruptcy Code provides that a plan of reorganization may be confirmed either consensually, § 1129(a)(8), or nonconsensually, § 1129(b). Only cramdown under § 1129(b) is relevant here because, as Kent submits, FGH—the only member of Class 4—will not vote for the Plan in its current form. To achieve confirmation of a nonconsensual plan, Kent must show that its Plan (1) satisfies all the requirements of § 1129(a), excluding (a)(8); (2) does not discriminate

9. Although the Code does not address the burden-of-proof issue, the Supreme Court has written that, at least in the context of dischargeability under § 523, "silence is inconsistent with the view that Congress intended to require a special, heightened standard of proof." *Grogan v. Garner,* 498 U.S. 279, 286, 111 S.Ct. 654, 659, 112 L.Ed.2d 755 (1991). Expanding the *Grogan* analysis, the Fifth Circuit recently held that the preponderance of the evidence standard applies in confirmation matters. *In re Briscoe Enterpris-* es Ltd., II, 994 F.2d 1160, 1165 (5th Cir.1993) ("The combination of legislative silence, Supreme Court holdings, and the structure of the Code leads this Court to conclude that preponderance of the evidence is the debtor's appropriate standard of proof under § 1129(a) and in a cramdown."); *In re Cellular Information Systems, Inc.,* Nos. 92–B–45024 through 92–B–45037, slip op. at 24–25 (Bankr.S.D.N.Y. Feb. 28, 1994) (Lifland, C.J.) (follows Fifth Circuit's analysis in *Briscoe, supra.*)

unfairly; (3) is fair and equitable with respect to each impaired class that has not accepted the plan; and (4) is accepted by at least one impaired, noninsider class. § 1129(b)(1); *See In re 500 Fifth Ave. Assocs., supra,* 148 B.R. at 1017 (citations omitted).

◼ Under the standards outlined in *Timbers* and its progeny, Kent must show that the Property is essential to an effective reorganization that is not only feasible but in prospect. Although Kent submitted its Plan several days before exclusivity expired, we review the Plan according to a "reasonable probability" standard because the parties argued and briefed their respective positions concerning FGH's motion after the passing of the exclusivity period. We note that Kent has not filed any amendments to its original Plan during the period between the filing of FGH's motion and the rendering of this decision.

◼ In materials submitted in support of its objection to FGH's motion, Kent offers an unsworn statement from H. Schultz, dated September 15, 1993, purportedly to show that rezoning is possible within a reasonable time. Mr. Schultz, a consultant, states that the "zoning and mapping" changes contemplated in the Plan necessitate that Kent complete an environmental impact statement ("EIS") and endure federal, state, and city review before rezoning can occur. Completion of the EIS, according to the letter, will require six to eight months unless an environmental remediation is necessary. Compliance with various public review processes will delay any sale an additional 20 to 24 months. Despite the delay, Mr. Schultz concludes that Kent's Plan can "proceed on schedule."

Mr. Schultz's comments, however, assuming their accuracy and admissibility, reveal the many contingencies and administrative obstacles confronting Kent in its hope for reorganization. Almost every level of government—from city planning board to the Army Corps of Engineers—must approve Kent's envisioned use of the Property. Any one of these administrative hurdles could permanently derail Kent's Plan and further frustrate FGH's right to payment.

◼ It goes without saying that an effective reorganization cannot be based solely on speculation. *Barclays Bank of New York, N.A. v. Saypol (In re Saypol),* 31 B.R. 796, 803 (Bankr.S.D.N.Y.1983). Moreover, an effective reorganization would not require a single undersecured creditor to bear the brunt of such speculation for two years in anticipation of a contingent sale. The inherent risks in Kent's Plan fall squarely on FGH because Kent has insufficient income to pay taxes, insurance, and maintenance costs as they come due. As adequate protection of FGH's collateral, the Plan promises little more than the rent assignments FGH currently receives until rezoning occurs, if it indeed does. If rezoning fails, FGH will be left with the costs accumulating from two years of delay. The Plan therefore fails to present an effective reorganization that is anything more than mere conjecture and debtor's euphoria.

## II. *Confirmation Analysis.*

◼ Kent proposes two methods to confirm its Plan over FGH's anticipated objection. First, Kent argues that the Plan is fair and equitable under § 1129(b)(2)(A)(ii) even though the Plan specifically denies FGH the opportunity to bid in its lien at both the Nekboh and Newco sales. Kent argues that FGH has no absolute right to credit bid because credit bidding is but one of three disjunctive examples of fair and equitable treatment under § 1129(b)(2)(A). Kent further argues that FGH's "bargained for rights are protected by the Plan which affords it all of the financial upside that is derived from the successful rezoning of the property while preserving for it recourse on the undersecured portion of its claim." Debtor's Supplemental Memorandum of Law at 10.

Second, Kent appears to argue that its Plan is fair and equitable under § 1129(b)(2)(A)(i) if FGH retains its lien in the Property and receives deferred cash payments equalling at least the allowed amount of its claim as of the consummation of the Plan, even if FGH has no right to elect fully

secured treatment under § 1111(b)(2).[10] According to Kent, FGH should not be able to make the § 1111(b)(2) election "on equitable grounds" because the Plan provides FGH with all the Property's enhanced value if rezoning occurs. Allowing FGH to make the election would, in Kent's words, allow FGH to "go to the well twice" and thereby "convert to its own benefit a property interest reserved for unsecured creditors." Debtor's Supplemental Memorandum of Law at 19. Kent nevertheless claims that its Plan is confirmable even if FGH exercises its § 1111(b) election, assuming that FGH's total allowed claim totals $13.46 million rather than $16.186 million. Kent concludes that FGH's recourse status alone satisfies § 1129(b)(2)(A)(i), even if FGH's collateral is sold under the Plan.

FGH responds that the Plan is patently unconfirmable because § 1129(b)(2)(A)(i) and (ii) require (1) that there be an immediate, noncontingent sale where FGH's lien would attach to all proceeds obtained from the liquidation of the Property and (2) that FGH have the opportunity to bid in its lien if Kent sells the Property under the Plan. In the event that we find the Plan confirmable under § 1129(b)(2)(A)(i) such that FGH has no right to credit bid, FGH argues that (1) § 1111(b)(2) supports its right to elect fully secured treatment; (2) Kent lacks the financial wherewithal to pay the entirety of FGH's $16.186 million allowed secured claim if FGH makes the election; and (3) the promise to pay FGH's $16.186 million allowed claim, when discounted for risk and the time value of money, is worth less than FGH's lien. FGH's Supplemental Memorandum of Law at 3–5.

We begin our analysis where all like inquiries must, with the statutes themselves. *United States v. Ron Pair Enterprises, Inc.,* 489 U.S. 235, 242, 109 S.Ct. 1026, 1031, 103 L.Ed.2d 290, 299 (1989). To prove probable feasibility, Kent must show that its treatment of FGH's secured claim is fair and equitable under § 1129(b).[11] Section 1129(b)(2)(A)(i), (ii), and (iii) provide certain minimum, nonexclusive requirements that a plan must meet with respect to secured creditors.[12] They are:

(i)(I) that the holders of [secured] claims retain the liens securing such claims, whether the property subject to such liens is retained by the debtor or transferred to another entity, to the extent of the allowed amount of such claims; and

(II) that each holder of a claim of such class receive on account of such claim deferred cash payments totaling at least the allowed amount of such claim, of a value,

**10.** Section 1111(b) provides as follows:
(1)(A) A claim secured by a lien on property of the estate shall be allowed or disallowed under section 502 of this title the same as if the holder of such claim had recourse against the debtor on account of such claim, whether or not such holder has such recourse, unless
(i) the class of which such claim is a part elects, by at least two-thirds in amount and more than half in number of allowed claims of such class, application of paragraph (2) of this subsection; or
(ii) such holder does not have such recourse and such property is sold under section 363 of this title or is to be sold under the plan.
(B) A class of claims may not elect application of paragraph (2) of this subsection if—
(i) the interest on account of such claims of the holders of such claims in such property is of inconsequential value; or
(ii) the holder of a claim of such class has recourse against the debtor on account of such claim and such property is sold under section 363 of this title or is to be sold under the plan.
(2) If such an election is made, then notwithstanding section 506(a) of this title, such claim is a secured claim to the extent that such claim is allowed.

**11.** "Fair and equitable" is a term of art. It is "an amorphous concept that which was purposely left undefined in the Bankruptcy Code to 'avoid statutory complexity' and to preserve judicial application of certain fundamental pre-Code factors to [e]nsure fair and equitable treatment of dissenting classes." *In the Matter of Kennedy,* 158 B.R. 589, 599 (Bankr.D.N.J.1993), *citing,* J. Friedman, *What Courts Do to Secured Creditors in Chapter 11 Cramdowns,* 14 Cardozo L.Rev. 1495, 1505 (1993) and K. Klee, *Cram Down II,* 64 Am.Bankr.L.J. 229, 231 (1990). *See* 5 L. King, *Collier on Bankruptcy,* ¶ 1129.03[2] at 1129-70—75 (15th ed. 1993) (discusses pre-Code cases involving fair and equitable standard).

**12.** Section 1129(b)(2)(A)(ii) states that a plan is fair and equitable to a dissenting class if it "includes" the treatment described in clause (i), (ii), or (iii). According to § 102(3), as a rule of construction, " 'includes' and 'including' are not limiting."

as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property;

(ii) for the sale, subject to section 363(k) of this title, of any property that is subject to the liens securing such claims, free and clear of such liens, with such liens to attach to the proceeds of such sale, and the treatment of such liens on proceeds under clause (i) or (iii) of this subparagraph; or

(iii) for the realization by such holders of the indubitable equivalent of such claims.

Section 1129(b)(2)(A)(i) permits cramdown if the dissenting class of secured claims retains its lien regardless of whether the debtor retains or transfers the collateral. The lien secures the creditor's allowed secured claim. *See* § 506(a). The amount of the allowed secured claim will, of course, vary depending on whether the class elects under § 1111(b)(2).[13]

Kent implicitly argues that it can deny FGH both its right to credit bid and its § 1111(b)(2) election because its liquidating plan is confirmable under clause (i). Clause (i) does not contain the specific reference to § 363(k) found in clause (ii).[14] At least one court has accepted a similar argument. *In re Broad Associates Ltd. Partnership*, 125 B.R. 707 (Bankr.D.Conn.1991) (Chapter 11 plan was fair and equitable despite mortgagee's inability to credit bid because mortgagee could make § 1111(b) election). Another court has held that undersecured creditors must be permitted to bid in their liens pursuant to any sale under a plan. *See John Hancock Mut. Life Ins. Co. v. California Hancock, Inc. (In re California Hancock, Inc.)*, 88 B.R. 226, 230 (9th Cir. BAP 1988) (plan that did not provide creditor with the opportunity to credit bid was unconfirmable).

In *Broad Associates, supra*, the debtor sought to confirm its plan under § 1129(b)(2)(A)(i). The plan provided for the sale of the estate's principal asset, a nine-story office building, subject to a first mortgagee's lien on the building; assigned rents to the first mortgagee; and proposed to pay the first mortgagee the present value of its secured claim in quarterly installments commencing approximately three months after confirmation. The first mortgagee objected to the plan and argued that it had an unconditional right to bid in its lien at the sale of its collateral. In denying the first mortgagee's objection, the court distinguished a sale free and clear of liens under § 363(k) from a sale subject to liens. The court held that the creditor did not have an unconditional right to credit bid because § 1129(b)(2)(A)(ii) is one of three alternative examples of fair and equitable treatment and because the creditor, as a nonrecourse lienholder, could elect fully secured treatment under § 1111(b). *Broad Associates, supra*, 125 B.R. at 712–13.

Unlike *Broad Associates*, Kent's Plan proposes to sell the Property free and clear of liens, rather than subject to FGH's first mortgage lien. Section 1111(b)(1)(B)(ii), however, expressly exempts a secured class's ability to elect fully secured treatment if collateral is sold under § 363(k), that is, free and clear of liens. The holding in *Broad Associates* is therefore distinguishable from the confirmation sought in Kent's Plan.

In *California Hancock*, like the matter now before us, the debtor argued that its liquidating plan satisfied the requirements of § 1129(b)(2)(A)(i) even though the plan prevented an undersecured creditor from bidding in its lien. The Bankruptcy Court granted the creditor's motion for relief from stay, finding that the proposed plan was unconfirmable because, *inter alia*, the plan did not allow the creditor to credit bid. Affirming Bankruptcy Judge Fenning's decision,

---

**13.** Navigating the labyrinthine corridors of § 1111(b) is a daunting, albeit familiar, journey for this court. *See 680 Fifth Ave. Assocs. v. Metropolitan Benefit Life Ins. Corp. in Rehab. (In re 680 Fifth Ave. Assocs.)*, 156 B.R. 726 (Bankr. S.D.N.Y.), *aff'd mem.*, 93 Civ. 3402, 1993 WL 719622 (S.D.N.Y. Sept. 29, 1993) (Sands, D.J.). While many a would-be Theseus has attempted this noble challenge (ourselves included), the mighty Minotaur remains alive and well.

**14.** Section 363(k) provides as follows:

> At a sale . . . of property that is subject to a lien that secures an allowed claim, unless the court for cause orders otherwise the holder of such claim may bid at such sale, and, if the holder of such claim purchases such property, such holder may offset such claim against the purchase price of such property.

the Ninth Circuit's Bankruptcy Appellate Panel wrote that credit bidding preserves the preferred recourse status conferred on lienholders by § 1111(b), thereby allowing the recourse creditor to recover the collateral and submit a deficiency claim against the bankruptcy estate. The Appellate Panel reached its decision following a detailed analysis of the complex interplay among §§ 363(k), 1111(b), and § 1129(b)(2)(A) and a review of the related legislative history. *In re California Hancock, supra,* 88 B.R. at 230.

Although we are inclined to agree with the holding in *California Hancock,* and indeed, do, the term "transfer" in § 1129(b)(2)(A)(i) lends some support to Kent's position. The Code defines "transfer" in the broadest of terms as "every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with property." § 101(58)[54]. Neither the Code nor its legislative history states whether Congress intended a "transfer" to include a *sale* of property, but such a reading is certainly possible. It is also less than clear, comparing the unequivocal language in § 1111(b)(2)(A)(ii) with that in clause (i), whether Congress intended clause (i) to apply to a sale of property under a plan such that the plan may be fair and equitable if an undersecured creditor does not have the opportunity to bid in its lien.[15] One learned commentator has stated that clause (i) may apply to sales that are subject to liens but not free and clear of liens. K. Klee, *All You Ever Wanted to Know About Cram Down Under the New Bankruptcy Code,* 53 Am. Bankr.L.J. 133, 155 n. 136 (1979) ("Under 11 U.S.C. § 1129(b)(2)(A)(i)(I) the lien must be retained whether the collateral is retained by the debtor or a successor to the debtor or is sold subject to the lien. If the collateral is sold free and clear of the lien, then 11 U.S.C. § 1129(b)(2)(A)(ii) is the controlling provision.")

FGH asks that we find a bright-line, absolute rule that a plan proposing the sale of collateral is not fair and equitable unless undersecured creditors can credit bid. Arguably, Congress intended an absolute right to credit bid in all liquidating plans when it formulated the relationship among §§ 363(k), 1111(b), and 1129(b):

> Sale of property under section 363 or under the plan is excluded from treatment under section 1111(b) because the secured party's right to bid in the full amount of his allowed claim at *any sale* of collateral under section 363(k) of the House Amendment.

124 Cong.Rec. H11103–05 (daily ed. Sept. 28, 1978); S17420–22 (daily ed. Oct. 6, 1978) (remarks of Rep. Edwards and Sen. DeConcini); *California Hancock, supra,* 88 B.R. at 230 (citations omitted). Although the legislative history[16] supports FGH's position, a better argument comes from the language and purpose of § 1111(b). *See In re 680 Fifth Ave. Assocs., supra,* 156 B.R. at 734 n. 12 (courts look to a statute's purpose when contemplating its meaning.)

It is conceptually difficult to reconcile the sale exception in § 1111(b)(1)(B)(ii) with a sale of property under § 1129(b)(2)(A)(i). Section 1111(b)(1)(A)(ii) shows that a nonrecourse secured creditor will either (1) have

---

**15.** As a rule of statutory construction, courts observe that where two provisions apply, the more specific governs. *International Playtex, Inc. v. Rapino (In re Rapino),* 11 B.R. 651, 657 (Bankr.E.D.N.Y.1981); *In re Masterworks, Inc.,* 100 B.R. 149, 152 (Bankr.D.Conn.1989). Certainly, § 1129(b)(2)(A)(ii) is more specific than clause (i) if property is sold free and clear of liens under a plan.

**16.** Our citation to the floor statements of Representative Edwards and Senator DeConcini in no way implies that we prefer legislative history over the words of the statutes. However, when a statutory ambiguity exists, reference to legislative history is instructive and proper. *See, e.g., Barn-*

*hill v. Johnson,* —— U.S. ——, ——, 112 S.Ct. 1386, 1391, 118 L.Ed.2d 39 (1992) ("appeals to statutory history are well-taken only to resolve 'statutory ambiguity.' "); *Toibb v. Radloff,* 501 U.S. 157, 162, 111 S.Ct. 2197, 2200, 115 L.Ed.2d 145 (1991), *quoting, Blum v. Stenson,* 465 U.S. 886, 896, 104 S.Ct. 1541, 1548, 79 L.Ed.2d 891 (1984) ("Where, as here, the resolution of a question of federal law turns on a statute and the intention of Congress, we look first to the statutory language and then to the legislative history if the statutory language is unclear.") *See generally,* W. Effross, *Grammarians at the Gate: The Rehnquist Court's Evolving "Plain Meaning" Approach to Bankruptcy Jurisprudence,* 23 Seton Hall L.Rev. 1636, 1754 (1993).

the right to credit bid if its collateral is sold under § 363(k) or under the plan or (2) have the right to recourse against the debtor with the additional option of seeking fully secured treatment under § 1111(b)(2). If the collateral is sold and the creditor bids in its lien, the creditor is likely to walk away with the property and have a deficiency claim against the debtor for the difference between the amount of the lien and the creditor's total claim. If the debtor retains the property, the creditor may either have a secured claim against the debtor to the amount of the lien and an unsecured claim for the deficiency or opt under § 1111(b)(2) to be treated as fully secured to the full amount of the claim. *See* 124 Cong.Rec. H11103–05; 124 Cong.Rec. S17420–22, *supra* (nonrecourse creditor's opportunity to credit bid when its collateral is sold equated with the creditor's opportunity to elect to be treated as fully secured if the debtor proposes to retain ownership of the collateral.) Moreover, § 1111(b) implicitly requires that a lienholder be permitted to credit bid because if no credit bid occurs, the lienholder "still bears the risk of undervaluation [17] because it cannot insist that it receive the property instead of the value determined by the bankruptcy court." *In re Woodbridge North Apts.*, 71 B.R. 189, 191 (Bankr.N.D.Co. 1987).

Kent simply misconstrues § 1111(b). First, the purpose of § 1111(b)(1)(A) is not satisfied by a sale at which the lienholder may not credit bid. *In re 222 Liberty Assocs.*, 108 B.R. 971, 980 (Bankr.E.D.Pa.1990) (citations omitted). Section 1111(b)(1)(A)(ii) preserves the benefit of a nonrecourse creditor's bargain if property is sold under § 363. *In re Woodbridge North Apts.*, *supra*, 71 B.R. at 192; 5 L. King, *Collier on Bankruptcy*, ¶ 1111.02 at 1111–31, 32 n. 22a (15th ed. 1993). Assuming the creditor is the successful bidder at the sale, the creditor is entitled under § 363(k) to offset the amount of its claim against the purchase price of the property. Under Kent's Plan, however, FGH has neither of the benefits created in § 363(k)

and § 1111(b) because FGH can neither credit bid nor make the § 1111(b)(2) election.

Second, Kent cannot unilaterally deprive FGH of its ability to make the § 1111(b)(2) election. In Plan ¶ 4.04, Kent states:

> The Allowed FGH Secured Claim of the Class 4 Claimant shall be fully satisfied and discharged as follows (there being no right to elect application of the Bankruptcy Code § 1111(b)(2) in that the Property is being sold under and pursuant to the Plan ... § 1111(b)(1)(B)(ii)) ...

Although Kent correctly asserts that a creditor cannot bid in its lien *and* make the § 1111(b) election, the lienholder is nevertheless entitled under the Code to do one or the other, depending on the particulars of the plan, to protect the benefit of its prepetition bargain. Under the Plan as proposed, FGH cannot elect fully secured treatment under § 1111(b)(2) because Kent's Plan contemplates the sale of FGH's collateral. § 1111(b)(1)(B)(ii).

If collateral is not sold under § 363(k) or under a plan, § 1111(b) clearly provides that the *secured class* decides whether to elect secured treatment under subsection (b)(2) to the extent its claim is allowed. § 1111(b)(1)(A)(i); *In re D & W Realty Corp.*, 165 B.R. 127, 128 (S.D.N.Y.1994) (Martin, D.J.). The class's ability to elect fully secured treatment is foreclosed only if, as provided in § 1111(b)(1)(B)(i) and (ii), the secured creditor's interest in the property is of "inconsequential value" or if the property is sold under § 363(k) or under the plan. Kent has no authority to deprive FGH's secured class of its right of election absent FGH's consent or the applicability of either of the two exceptions provided in § 1111(b)(1)(B)(i) and (ii).

After our review of the legislative history and the developing case law, we agree with FGH that the "absolute approach" best preserves the intent of Congress and the purposes advanced in §§ 363(k), 1111(b), and 1129(b)(2)(A)(ii). If a plan proposes the sale

---

17. Valuation is yet another justification for finding an absolute right to credit bid when collateral is sold under a plan of reorganization. Credit bidding allows the secured creditor to substitute a market-based valuation, as determined after competitive bidding in an actual sale, for what is arguably an inferior judicial determination of value under § 506(a). *See* D. Schian, *Section 1111(b)(2): Preserving the In Rem Claim*, 67 Am. Bankr.L.J. 479 (1993).

of a creditor's collateral free and clear of liens, the lienholder has the unconditional right to bid in its lien.

We therefore hold that Kent can not foreclose FGH's right to bid in its lien if the Property is sold pursuant to the Plan. A secured creditor's right to credit bid lies at the core of cramdown jurisdiction. A liquidating plan is fair and equitable to a nonconsenting class of secured creditors if it provides "for the sale, subject to section 363(k) of this title, of any property that is subject to the liens securing such claims...." § 1129(b)(2)(A)(ii). The relevant lien must then attach to the proceeds of the sale in a manner consistent with § 1129(b)(2)(A)(i) and (iii).[18] Accordingly, credit bidding preserves the nonrecourse lienholder's bargain that, in the event of default, the lienholder may seek satisfaction of the debt from the collateral. Section 1129(b)(2)(A)(ii) unequivocally says just that: if a debtor sells property free and clear of liens and attempts confirmation under the Code's cramdown provisions, a debtor must allow the secured creditor to bid in its lien.

### Conclusion

The Plan is impermissibly speculative because it assumes that rezoning of the Property will occur within two years of the Plan's effective date. The Plan is not "fair and equitable" under § 1129(b)(2)(A)(ii) unless FGH is entitled to bid in its entire lien if its collateral is sold free and clear of liens under the Plan. Kent cannot unilaterally dispossess FGH of its statutory right to elect fully secured status under § 1111(b)(2). FGH's ability to elect is, however, foreclosed if the Property is sold free and clear of liens.

For these reasons, Kent's Plan is patently unconfirmable under the standards articulated in *Timbers* and its progeny. FGH's motion for relief from stay will be GRANTED.

FGH is to settle an order on five days notice consistent with this Memorandum of Decision.

---

**18.** For example, under § 1129(b)(2)(A)(i), Kent could not sell or otherwise transfer the Property free and clear of FGH's first mortgage without paying 100% of FGH's allowed claim to the extent possible with the proceeds of the sale. Under the absolute priority rule, a court may not confirm a plan of reorganization over the objections of a secured creditor unless the holders of junior claims receive no property. *In re Anderson*, 913 F.2d 530, 532 (8th Cir.1990), *citing*, § 1129(b)(2)(B)(ii). Thus, Kent cannot pay a junior class of claims before paying FGH's allowed claim.